## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MONTERRA MF, LLC; ARMANDO CODINA, an individual; JAMES CARR, an individual; NORMAN BRAMAN, an individual; 2020 BISCAYNE BOULEVARD, LLC; 2060 BISCAYNE BOULEVARD, LLC; 2060 NE 2ND AVE., LLC; 246 NE 20TH TERRACE, LLC; and NO CASINOS, a Florida 501(c)(4) organization,

        Plaintiffs,

        v.

DEB HAALAND, in her official capacity as Secretary of the United States Department of the Interior, and UNITED STATES DEPARTMENT OF THE INTERIOR,

        Defendants.

Case No. 21-cv-2513

## COMPLAINT

Glenn Burhans, Jr.*
Robert J. Walters*
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON PA
Highpoint Center
106 East College Avenue, Suite 700
Tallahassee, FL 32301

Eli J. Kay-Oliphant, D.C. Bar No. 503235
eli.kay-oliphant@sparacinopllc.com
Ryan R. Sparacino, D.C. Bar No. 493700
ryan.sparacino@sparacinopllc.com
SPARACINO PLLC
1920 L Street, NW, Suite 535
Washington, D.C.  20036
(202) 629-3530

Eugene E. Stearns*
Grace L. Mead*
Jenea M. Reed*
Coral Del Mar Lopez*
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON PA
150 West Flagler Street, Suite 2200
Miami, Florida  33130

*Counsel for Plaintiffs*

*Pro hac vice applications forthcoming*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

JURISDICTION AND VENUE ........................................................................ 5

THE PARTIES................................................................................................... 5

THE GOVERNING FEDERAL STATUTORY SCHEME AND RELATED FEDERAL
LAWS ............................................................................................................... 11

BACKGROUND AND FACTS ....................................................................... 14

    A.      The History of Gambling in Florida ................................... 14

    B.      The 2010 Gaming Compact .................................................. 16

    C.      Amendment 3 to Florida's Constitution ............................. 17

    D.      The 2021 Gaming Compact .................................................. 20

    E.      DOI Review of the 2021 Compact....................................... 25

    F.      Federal Litigation Challenging Sports Betting ................. 30

    G.      Federal Litigation Challenging DOI "Approval" of the 2021 Compact.............. 31

CAUSES OF ACTION ..................................................................................... 32

    COUNT 1 VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT ................. 32

    COUNT 2 DECLARATORY AND INJUNCTIVE RELIEF ............................................ 36

PRAYER FOR RELIEF ................................................................................... 37

## INTRODUCTION

1.      Plaintiffs, Florida-based businesses and property owners, sue here to invalidate unlawful federal agency action that allows the unprecedented expansion of gambling throughout the State of Florida under the guise of granting a Tribe exclusive rights to, among other things, electronic wagering. That agency action violates state and federal law.

2.      Florida political officials and voters have long disapproved of widespread gambling in the State, as evidenced by the general statutory prohibition of gambling, with limited exceptions. In 2018, Florida voters passed Amendment 3 to its Constitution, which gave voters the exclusive right to authorize casino gambling in Florida. Amendment 3 was overwhelmingly approved by 5,676,456 voters (71.5%). *See* Florida Department of State, Division of Elections https://results.elections.myflorida.com (Nov. 2018 General Election Results, Constitutional Amendments). Under Amendment 3, casino gambling can only be authorized through a citizens' initiative.

3.      The United States Department of the Interior ("DOI") improperly allowed the State of Florida to circumvent Amendment 3 and its citizens' initiative requirement, as well as state law limiting the permissible scope of gambling in Florida, and federal law incorporating that state law. In 2021, Florida's Governor entered into a Compact with the Seminole Tribe of Florida ("Seminole Tribe") that authorizes gambling activities that were never previously legal in Florida (the "2021 Compact"). Exs. 1, 2.[1] These unlawful attempts to expand gambling without voter authorization violate Amendment 3 to Florida's Constitution as well as federal laws incorporating it, including the Indian Gaming Regulatory Act ("IGRA").

---

[1] References to "Ex. ___" are to the exhibits attached this Complaint. Emphasis, internal quotations, and internal citations are omitted unless otherwise indicated.

4.      The sports betting provisions also independently violate additional federal laws, including IGRA, the Wire Act, and the Unlawful Internet Gambling Enforcement Act ("UIGEA"), by authorizing gambling outside of Indian lands and by allowing the use of the Internet or interstate payment transmissions where sports betting is illegal.

5.      DOI ignored these violations of state and federal law and approved the 2021 Compact. *See* Exs. 3-5.

6.      The Seminole Tribe currently operates three casino facilities in Broward County, Florida, including the Seminole Hard Rock Hotel & Casino at 1 Seminole Way, Hollywood, FL 33314 ("the Hard Rock"). Before entering into recent negotiations with the State of Florida, the Seminole Tribe had very limited rights to engage in Class III gaming, which is subject to strict requirements under IGRA. The only Class III casino games authorized at the Hard Rock prior to the 2021 Compact are slot machines and certain banking card games, including blackjack.

7.      Under the 2021 Compact, the Seminole Tribe obtained exclusive rights to operate additional games, including craps, roulette, and sports betting which are not legal in Florida and vastly expand the Seminole Tribe's Class III gaming operations. The 2021 Compact also allows the Seminole Tribe to add three additional gambling facilities near the Hard Rock. This combination of rights under the 2021 Compact, approved by the DOI, effectively creates a so-called "Casino Strip" that substantially expands and transforms gambling's footprint in South Florida.

8.      Additionally, the Seminole Tribe will engage in sports betting throughout Florida with the substantial involvement of commercial, non-tribal gambling entities that will solicit and execute bets outside of Indian lands. This allows anyone in Florida over the age of 21 to make sports betting wagers over the Internet or by cell phone or by another electronic device from a

2

location outside of Tribal lands. This model of mobile sports betting has been coined the "hub and spoke" model—the Seminole Tribe serves as the hub for receiving wagers, and the various contractors and mobile apps that facilitate bets statewide outside of Indian lands are the spokes.

9.      The 2021 Compact purports to limit sports betting to individuals "physically located in the State," but provides no mechanism for determining the physical location of bettors. Ex. 1 at 15. As discussed, ¶¶ 74-75 below, bettors can purchase software and apps to evade these supposed geographical limitations on sports betting. Accordingly, the 2021 Compact's "hub and spoke" model clearly implicates interstate commerce and governing federal laws including the Wire Act and UIGEA. On all these topics, the DOI said nothing.

10.      West Flagler Associates, Ltd. ("West Flagler") is one of the non-tribal entities eligible to be a "spoke" in the sports betting model authorized by the 2021 Compact. Under a Settlement Agreement entered with the City of Miami in 2021, West Flagler can conduct pari-mutuel wagering at its facility in the Edgewater neighborhood of the City. That Settlement Agreement also provided: "[I]f gaming or wagering activities on sports (also known as 'sports betting') are made lawful and generally available to all residents of the State of Florida, either online or at professional sports venues under state law, then West Flagler will be permitted to conduct such sports betting at the Location on such terms and conditions as provided by state law."

11.      DOI is statutorily authorized to review a compact "governing gaming on Indian lands" to determine whether it complies with law. 25 U.S.C. § 2710(d)(8).

12.      DOI "may disapprove" any compact that violates IGRA, any provision of IGRA, any other federal law, or the trust obligations of the United States to Indians, 25 U.S.C. § 2710(d)(8)(B), but any compact that violates any of those laws cannot be considered approved, 25 U.S.C. § 2710(d)(8)(C). Indeed the first paragraph of the DOI's letter recognizes "the Compact is

3

considered to have been approved by operation of law *to the extent that it complies with IGRA and existing Federal law*." Ex. 5 at 1.

13.     And the DOI's statutory authority is limited to the review of compacts "governing gaming on Indian lands." 25 U.S.C. § 2710(d)(8)(A). The DOI has no statutory jurisdiction over a compact that would expand gaming *outside* of Indian lands.

14.     Under the APA, the DOI's approval here was unlawful. The APA forbids agency action that is arbitrary and capricious because it ignores a factor the agency is required consider or an important aspect of the problem. The APA also requires setting aside agency action that is contrary to the law. The DOI approval of the 2021 Compact here is therefore beyond DOI's jurisdiction, arbitrary and capricious, and contrary to the law.

15.     DOI and its Secretary unlawfully approved the 2021 Compact even though it violates IGRA and other federal laws. IGRA provides: "Class III gaming activities shall be lawful on Indian lands only if such activities… are located in a State that permits such gaming for any purpose by any person, organization, or entity." 25 U.S.C. § 2710(d)(1)(B). But the 2021 Compact authorizes the Seminole Tribe to conduct new Class III games "on tribal lands," including craps and roulette that are unlawful for anyone else in the State.

16.     IGRA also authorizes lawful Class III gaming only "*on Indian Lands*," which does not permit the expansive statewide "hub and spoke" sports betting model contemplated by the 2021 Compact that would permit sports bets to be made and received outside of Tribal lands, nor the significant expansion of casino gaming in violation of state law. 25 U.S.C. § 2710(d)(1). Other federal statutes, including the Wire Act and the UIGEA, further prohibit the gaming authorized under the 2021 Compact.

17.     Certain gambling interests—including West Flagler—have sued in this Court challenging the sports betting provisions of the 2021 Compact. West Flagler claims that the 2021 Compact hurts its business because "the Compact precludes [West Flagler] from competing with the [Seminole] Tribe even within [its] own pari-mutuel facilities in offering sports wagering and online sports wagering" and requires West Flagler to "be one of the spokes on terms and conditions dictated exclusively by the [Seminole] Tribe." *West Flagler et al. v. Haaland et al.*, No. 1:21-cv-02192 (D.D.C. filed Aug. 16, 2021), DE 1 ¶¶ 117, 140. By contrast to West Flagler's lawsuit brought by plaintiffs who have sought to expand their gambling activities, Plaintiffs here oppose gambling expansion.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal laws including the Administrative Procedure Act, 5 U.S.C. § 702, the Declaratory Judgement Act, 28 U.S.C. § 2201, and the IGRA, 25 U.S.C. §§ 2701 *et seq.*

19.     Venue is proper in this District under 28 U.S.C. § 1391(e), which provides that a civil action against an agency of the United States government may be brought "in any judicial district in which . . . a defendant in the action resides." Defendants maintain their official offices in the District of Columbia.

20.     This Court is authorized to grant declaratory relief under 28 U.S.C. § 2201(a) and further necessary or proper relief under 28 U.S.C. § 2202.

21.     All conditions precedent to filing this lawsuit have been satisfied. Neither IGRA nor the Administrative Procedure Act contains an administrative exhaustion requirement.

## THE PARTIES

22.     Plaintiff Monterra MF, LLC is a Florida Limited Liability Company that has long-term ownership and management interests in the Property known as The Residences at Monterra

5

Commons ("Monterra Commons"), located at 3991 NW 82nd Avenue, Cooper City, FL 33024. Monterra Commons, which is designed for independent senior living, forms part of a 600-acre community developed by Plaintiffs Armando Codina and Jim Carr. Monterra MF, LLC is actively marketing units for annual leases, and has entered annual leases, for units in Monterra Commons. Monterra Commons contains 175 age-restricted rental units located in Broward County, Florida approximately 2.5 miles from the Hard Rock.

23.     Plaintiff Armando Codina is a businessman and longtime resident of Miami-Dade County, Florida who has opposed casino-style gambling in South Florida for decades. As further explained above, ¶ 22, he has business interests located near the Hard Rock. Mr. Codina's interests are negatively impacted by the DOI approval of the 2021 Compact, which purports to allow the Seminole Tribe to vastly expand gambling in Broward County, Florida and beyond. Mr. Codina has also contributed financially to Plaintiff No Casino's efforts to oppose the expansion of gambling in Florida, described below, ¶ 30.

24.     Plaintiff James ("Jim") Carr is a businessman and longtime resident of Miami-Beach, Florida, who has opposed casino-style gambling in South Florida for decades. As further explained above, ¶ 22, he has business interests located near the Hard Rock. Mr. Carr's interests are negatively impacted by the DOI approval of the 2021 Compact, which purports to allow the Seminole Tribe to vastly expand gambling in Broward County, Florida and beyond.

25.     Plaintiff Norman Braman is a businessman and longtime resident of Miami-Dade County, Florida who has opposed casino-style gambling in South Florida for decades. As further explained below, ¶¶ 26-29, he principally owns or controls entities that own many properties in the immediate vicinity of the West Flagler site that would seek to engage in sports betting activities in the Edgewater neighborhood of the City of Miami. Mr. Braman's Edgewater properties are

negatively impacted by the DOI approval of the 2021 Compact, which purports to allow non-tribal facilities, like the one owned by West Flagler, to engage in sports betting on behalf of the Seminole Tribe. Mr. Braman has also contributed financially to Plaintiff No Casino's efforts to oppose the expansion of gambling in Florida, described below, ¶ 30.

26.     Plaintiff 2020 Biscayne Boulevard, LLC ("2020 Biscayne"), an entity principally owned and controlled by Norman Braman, is a Delaware limited liability company registered to do business in Florida that, since 2012, owns and has owned the property at 2020 Biscayne Boulevard in the City of Miami. 2020 Biscayne is located less than 1 mile from the West Flagler Edgewater location.

27.     Plaintiff 2060 Biscayne Boulevard, LLC ("2060 Biscayne"), an entity principally owned and controlled by Norman Braman, is a Delaware limited liability company registered to do business in Florida that, since 2012, owns and has owned the property at 2060 Biscayne Boulevard in the City of Miami. 2060 Biscayne is located less than 1 mile from the West Flagler Edgewater location.

28.     Plaintiff 2060 NE 2nd Ave., LLC ("2060 NE 2nd Ave."), an entity principally owned and controlled by Norman Braman, is a Delaware limited liability company registered to do business in Florida that, since 2012, owns and has owned the property at 2060 NE 2nd Avenue in the City of Miami. 2060 NE 2nd Ave. is located less than 1 mile from the West Flagler Edgewater location.

29.     Plaintiff 246 NE 20th Terrace, LLC ("246 NE 20th Terrace"), an entity principally owned and controlled by Norman Braman, is a Delaware limited liability company registered to do business in Florida that, since 2012, owns and has owned the property at 246 NE 20th Terrace

in the City of Miami. 2060 Biscayne is located less than 1 mile from the West Flagler Edgewater location.

30.      No Casinos is a Florida 501(c)(4) organization that opposes the expansion of gambling in Florida. Founded in the late 1970s, and reestablished in 2011, it opposes the expansion of gambling in Florida. No Casinos was actively involved in the drafting and passage of Amendment 3 to Florida's Constitution, which "ensures that Florida voters shall have the exclusive right to decide whether to authorize casino gambling in the State of Florida." *See Advisory Opinion to the Attorney General re: Voter Control of Gambling in Florida*, 215 So. 3d 1209, 1212 (Fla. 2017) (approving constitutional amendment ballot language). No Casinos submitted a letter to DOI urging the Secretary to disapprove the 2021 Compact because it violates Amendment 3 and the federal laws identified in this Complaint. DOI's approval of the 2021 Compact has caused No Casinos to divert important resources to address this unlawful expansion of gambling.

31.      The following map depicts the location of the property owned by Plaintiff Monterra MF, LLC relative to the Hard Rock.



Select Entertainment Venues
Licensed Treatment Centers
Private Schools
Religious Institutions
Home Owner & Condo Associations
Monterra Commons
Seminole Hard Rock Cafe

SOURCES:
Florida Department of Business and Professional Regulation
Florida Department of Children and Families
Florida Department of Revenue
Florida Department of Health

This map is a general depiction of boundaries obtained from public records and is not a legal description or survey.

TITLE:
**Selected Entities**
**1, 2, & 3 Mile Radius**

PROJECT:
Seminole Hard Rock Cafe
City of Hollywood, Florida

**STEARNS WEAVER MILLER**
MIAMI | FORT LAUDERDALE | TAMPA | TALLAHASSEE | CORAL GABLES

32.    The following map depicts the location of properties owned by entities principally owned or controlled by Norman Braman, including Plaintiffs 2020 Biscayne Blvd., LLC, 2060 Biscayne Boulevard, LLC, 2060 NE 2nd Ave., LLC, and 246 NE 20th Terrace, LLC, in Miami-Dade County relative to the Edgewater Location at 2200 Biscayne Blvd., owned or controlled by West Flagler, where gambling could be expanded to include substantial sports betting operations.



33.    By allowing new forms of Class III gaming activities on and off Indian lands and in violation of Amendment 3's voter approval requirement, the DOI approval adversely impacts

10

Plaintiffs' properties and neighborhoods by, among other things, increasing neighborhood traffic, increasing neighborhood congestion, increasing criminal activity, reducing open spaces, and reducing their property values.[2]

34.     By allowing new forms of Class III gaming activities on and off Indian lands and in violation of Amendment 3's voter approval requirement, the DOI approval has deprived Plaintiffs of their rights to participate in any citizens' initiative, where the issue of any gambling expansion must be decided under the Florida Constitution.

35.     Defendant Deb Haaland ("Secretary Haaland") is the Secretary of the United States Department of the Interior. IGRA grants her the authority to approve or disapprove compacts between any Tribe and State governing gaming on Indian lands. 25 U.S.C. § 2710(d)(8); *see also* 25 C.F.R. §§ 293.3, 293.14. Plaintiffs sue Secretary Haaland is her official capacity.

36.     Defendant DOI is an executive department of the U.S. government that, among other things, "honors our nation-to-nation relationship with Tribes." https://www.doi.gov/about.

## THE GOVERNING FEDERAL STATUTORY SCHEME
## AND RELATED FEDERAL LAWS

37.     Before 1988, federal law lacked clear standards and regulations governing gaming on Indian lands. *See* 25 U.S.C. § 2701(3). That year, Congress passed the Indian Gaming Regulatory Act ("IGRA") to try to remedy that deficiency and provide government oversight for gaming on Indian lands. 25 U.S.C. §§ 2701 *et seq*. As explained by the National Indian Gaming Commission, IGRA expressly regulates gambling on Indian lands. https://www.nigc.gov/general-counsel/indian-gaming-regulatory-act.

---

[2] For an overview of the literature on these economic and social costs, see National Association of Realtors, *Economic Impact of Casinos on Home Prices: Literature Survey and Issue Analysis* (2013) (available at http://stoppredatorygambling.org/wp-content/uploads/2014/07/2013-Realtor-study-NAR-Casino-Research.pdf).

38.     While recognizing the importance of Tribal self-governance and sovereignty, IGRA specified that Tribes could only conduct gaming activities that are lawful within the individual state. *See* 25 U.S.C. § 2701(5). Accordingly, IGRA does not authorize Tribes to engage in activities that are otherwise unlawful in a state. Congress authorized Class III gaming on Indian lands only to the extent that such gaming activity is "located in a State that permits such gaming for any purpose by any person, organization, or entity." 25 U.S.C. § 2710(d)(1)(B).

39.     IGRA recognizes three "classes" of gaming. Class I is reserved for social games and traditional forms of Indian gaming. 25 U.S.C. § 2703(6). Class II includes bingo and certain card games authorized or not prohibited under state law. 25 U.S.C. § 2703(7). Class III is a catch-all that includes, "all forms of gaming that are not class I or class II gaming." 25 U.S.C. § 2703(8). Class III games are the most heavily regulated under IGRA.

40.     Sports betting, craps, and roulette, are not specifically referenced in the class definitions, and therefore fall within Class III, as recognized by the implementing regulations: "Class III gaming means all forms of gaming that are not class I gaming or class III gaming, including but not limited to . . . [a]ny sports betting." 25 C.F.R. § 502.4(c); *see also* 25 U.S.C. § 2703(8).

41.     Under IGRA, Class III gaming is lawful on Indian lands only if three specific requirements are met: (1) it must be authorized by the Tribe; (2) it must be located in a State that allows that gaming activity "for any purpose by any person, organization, or entity," and (3) it must be conducted pursuant to a Compact entered between the Tribe and the State. *See* 25 U.S.C. § 2710(d)(1).[3]

---

[3] IGRA vested the Secretary of the Department of the Interior with statutory authority to approve or disapprove any Compact entered between a Tribe and a State. *See* 25 U.S.C. § 2710(d)(8).

42.     By its terms, IGRA only governs gaming conducted by an "Indian tribe" on "Indian lands." *See* 25 U.S.C. §§ 2701, 2702. Those phrases are statutorily defined to include very limited and specific areas and groups, which cannot be expanded without a statutory amendment. *See* 25 U.S.C. § 2703(4),(5).

43.     Given the text, structure, and stated purpose of IGRA, any analysis under IGRA necessarily requires an analysis of the incorporated state law governing gaming. IGRA also requires an analysis of whether a compact violates "any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands." 25 U.S.C. § 2710(d)(8)(B).

44.     The Federal Wire Act criminalizes the use of "a wire communications facility" to transmit interstate sports bets or wagers and related information. *See* 18 U.S.C. § 1084. It applies to anyone "engaged in the business of betting or wagering," which would include the Seminole Tribe and non-Tribal pari-mutuels that are permitted to contract with the Tribe for sports betting operations. *See* 18 U.S.C. § 1081.

45.     As defined by the Wire Act, prohibited use of a wire communications facility in interstate or foreign commerce includes "any and all instrumentalities, personnel, and services (among other things, the receipt, forwarding, or delivery of communications) used or useful in the transmission of writings, signs, pictures, and sounds of all kinds by the aid of wire, cable or other like connection *between the points of origin and reception of such transmission*." *See* 18 U.S.C. § 1081.

46.     In 2006, Congress passed the Unlawful Internet Gambling Enforcement Act, which prohibits gambling entities from knowingly accepting payments from someone participating in "unlawful Internet gambling." Like the Wire Act, it applies to anyone "engaged in the business of betting or wagering," which would include the Seminole Tribe and the non-Tribal pari-mutuels

13

who are permitted to contract with the Tribe for sports bettering operations, if the transaction involves "unlawful Internet gambling." 31 U.S.C. § 5363. "Unlawful Internet gambling" means "to place, receive, or otherwise knowingly transmit a bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is *initiated, received, or otherwise made*." 31 U.S.C. § 5362 (10)(A).

47.     UIGEA specifies that "[t]he intermediate routing of electronic data shall not determine the location or locations in which a bet or wager is initiated, received, or otherwise made." 31 U.S.C. § 5362(10)(E).

48.     The sports betting proposed here through the Internet clearly implicates the Wire Act and UIGEA, in addition to IGRA.

## BACKGROUND AND FACTS

### A.     The History of Gambling in Florida

49.     Gambling is illegal in Florida unless specifically authorized by the Legislature. Florida Statute § 849.08 titled "Gambling" provides: "Whoever plays or engages in any game at cards, keno, roulette, faro or other game of chance, at any place, by any device whatever, for money or other thing of value, shall be guilty of a misdemeanor of the second degree."

50.     Florida has a long history of opposition to the expansion of gambling in the State. Although horse racing, dog racing, and jai alai have been part of Florida's history since the 1930s, there has been significant resistance to further expansion of legalized gambling in the State.

51.     Florida voters have repeatedly rejected casino gambling initiatives, first in 1978 with more than 70% of voters rejecting a proposal that would have allowed casinos in Dade and Broward counties. In 1986, 68% of Florida voters again refused to approve casino gambling, even

if limited to large hotels with more than 500 rooms. Casino gambling was again rejected in 1994

by 62% of Florida voters.

52. Limited exceptions to the default prohibition on gambling have emerged over the

years through limited legislative initiatives permitting certain gaming activities:

      a.     Pari-mutuel wagering, defined as "a system of betting on races or games in which the winners divide the total amount bet, after deducting management expenses and taxes, in proportion to the sums they have wagered individually and with regard to the odds assigned to particular outcomes," is permitted under Chapter 550 of the Florida Statutes. Fla. Stat. § 550.002(22). Pari-mutuel is limited to horse tracks and jai alai facilities licensed by the state, which is consistent with Florida's long acceptance of these forms of gambling.[4]

      b.     In 1986, Florida voters approved a state lottery. *See* Fla. Const. Art. X, § 15.

      c.     In 1996, the Florida Legislature authorized cardrooms at existing pari-mutuel facilities. *See* Fla. Stat. § 849.086. Games are limited to poker and dominoes, and are expressly not deemed casino gaming operations. Fla. Stat. § 849.086(2)(a), (c).

      d.     In 2004, Florida voters narrowly approved a constitutional amendment that allowed Miami-Dade County and Broward voters to approve slot machines at existing pari-mutuel facilities. Fla. Const., art. X, § 23. Voters in both counties eventually passed referenda allowing this new form of gambling in the state.

53. No one in Florida could lawfully engage in sports betting, craps, or roulette, absent

the 2021 Compact. *See*, *e.g.*, Fla. Stat. § 849.14. These activities remain unauthorized forms of

gambling in Florida that have not been approved by voters.

54. Similarly, sports betting is illegal in a number of other states, including but not

limited to Florida's neighbors—Alabama and Georgia. *See* Ala. Code § 13A-12-21; Ga. Code

---

[4] *See* Florida Senate Bill Analysis and Fiscal Impact Statement, SB2A Implementation of the 2021 Gaming Compact at 4 (May 14, 2021). Greyhound racing was also previously permitted, but was abolished by voters effective January 1, 2021. *See* Fla. Const., art. X, § 32 (prohibiting dog and greyhound racing).

Ann. § 16-12-21; *see also* Ryan Rodenberg, Espn.com, *United States of Sports Betting: An Updated Map of Where Every State Stands* (June 1, 2021), https://www.espn.com/chalk/story/_/id/19740480/the-united-states-sports-betting-where-all-50-states-stand-legalization.

55.     In 2007, years after the passage of IGRA, Florida's then-Governor Charlie Crist executed a compact with the Seminole Tribe that would have vastly expanded gambling on Indian lands beyond what had been approved by the Legislature. The Florida Supreme Court invalidated the compact and ruled that Crist was not authorized to execute a compact that violated state law. *Florida House of Representatives v. Crist*, 999 So. 2d 601, 616 (Fla. 2008). Florida's Governor lacks the constitutional authority to bind the State to a gaming compact that legalizes specific forms of gaming that are illegal in the state. *Id*.[5]

56.     The Florida Legislature then authorized banked card games and slot machines at certain tribal facilities under the 2010 Compact between the Seminole Tribe and the State of Florida. *See* Fla. Stat. § 285.710(13). This legislative authorization occurred before the 2018 passage of Amendment 3. *See* Section C, below.

B.      **The 2010 Gaming Compact**

57.     "The Seminole Tribe of Florida has played, perhaps, the most important role in the origins and development of Indian gaming in the United States of any single tribe." Matthew L. Fletcher, *The Seminole Tribe and the Origins of Indian Gaming*, 9 FIU Law Review 255 (2014). The 2010 Compact permitted the Seminole Tribe additional Class III gaming activities, including baccarat, chemin de fer, and blackjack, which the Legislature expressly authorized only at tribal

---

[5] The Florida Supreme Court expressly refused to address whether the 2007 Compact violated IGRA. *Crist*, 999 So. 2d at 615.

facilities operating under the 2010 compact. Fla. Stat. § 285.710(13)-(14). The 2010 Compact also gave the Seminole Tribe the exclusive right to operate slot machines outside of pari-mutuel facilities in Miami-Dade and Broward Counties.

58.     The Seminole Tribe negotiated a clause that created a financial disincentive for the State to expand gambling. If in the future, the state authorized Class III gaming rights for any other entity that was not in operation as of February 1, 2010, the Tribe could cease certain revenue payments to the State under the 2010 Compact.

59.     The 2010 Compact effectively provided the Seminole Tribe a monopoly on Class III gaming, except for those pari-mutuel facilities that already had slot machines under the 2004 constitutional amendment.

60.     Former Florida Governor Rick Scott negotiated a new Compact with the Seminole Tribe in 2015 that would have authorized craps and roulette on Indian lands, but failed to gain the approval of the Legislature. Sun Sentinel Editorial Board, *Failure of Seminole Gambling Deal Has Consequences* (Mar. 9, 2016), https://www.sun-sentinel.com/opinion/editorials/fl-editorial-seminole-compact-20160309-8-story.html.

**C.     Amendment 3 to Florida's Constitution**

61.     Under the 2010 Compact, the Seminole Tribe could offer slot machines and blackjack at several locations in the state, including the Hard Rock. As of 2018, non-tribal entities were not similarly situated, and only a handful of pari-mutuel facilities were licensed to offer slot machines in Broward and Miami-Dade Counties. *See* The Florida Senate, Bill Analysis and Fiscal Impact Statement at p.3, Implementation of the 2021 Gaming Compact (May 14, 2021), https://www.flsenate.gov/Session/Bill/2021A/2A/Analyses/2021s00002A.pre.ap.PDF

62.     Fearing further expansion of gambling, Florida voters in 2018 overwhelmingly approved a citizens' initiative that amended Florida's Constitution to give voters final and

exclusive authority over whether to approve casino gambling in Florida.[6] Under the amendment, the power to authorize casino gambling was taken away from the Legislature and placed exclusively in the hands of Florida voters, through a citizens' initiative.

63.     Amendment 3 was included in Article X, § 30 of the Florida Constitution, which provides in full:

**SECTION 30. Voter control of gambling in Florida.—**

(a)     This amendment ensures that Florida voters shall have the exclusive right to decide whether to authorize casino gambling in the State of Florida. *This amendment requires a vote by citizens' initiative pursuant to Article XI, section 3, in order for casino gambling to be authorized under Florida law.* This section amends this Article; and also affects Article XI, *by making citizens' initiatives the exclusive method of authorizing casino gambling.*

(b)     *As used in this section, "casino gambling" means any of the types of games typically found in casinos and that are within the definition of Class III gaming in the Federal Indian Gaming Regulatory Act, 25 U.S.C. ss. 2701 et seq. ("IGRA"), and in 25 C.F.R. s. 502.4,* upon adoption of this amendment, and any that are added to such definition of Class III gaming in the future. This includes, but is not limited to, any house banking game, including but not limited to card games such as baccarat, chemin de fer, blackjack (21), and pai gow (if played as house banking games); any player-banked game that simulates a house banking game, such as California black jack; casino games such as roulette, craps, and keno; any slot machines as defined in 15 U.S.C. s. 1171(a)(1); and any other game not authorized by Article X, section 15, whether or not defined as a slot machine, in which outcomes are determined by random number generator or are similarly assigned randomly, such as instant or historical racing. As used herein, "casino gambling" includes any electronic gambling devices, simulated gambling devices, video lottery devices, internet sweepstakes devices, and any other form of electronic or electromechanical facsimiles of any game of chance, slot machine, or casino-style game, regardless of how such devices are defined under IGRA. As used herein, "casino gambling" does not include pari-mutuel wagering on horse racing, dog racing, or jai alai exhibitions. For purposes of this section, "gambling" and "gaming" are synonymous.

---

[6] More than 5.6 million voters (71.5%) approved Amendment 3. *See* Florida Department of State, Division of Elections https://results.elections.myflorida.com (Nov. 2018 General Election Results, Constitutional Amendments).

(c)   Nothing herein shall be deemed to limit the right of the Legislature to exercise its authority through general law to restrict, regulate, or tax any gaming or gambling activities. In addition, *nothing herein shall be construed to limit the ability of the state or Native American tribes to negotiate gaming compacts pursuant to the Federal Indian Gaming Regulatory Act for the conduct of casino gambling on tribal lands, or to affect any existing gambling on tribal lands pursuant to compacts executed by the state and Native American tribes pursuant to IGRA.*

(d)   This section is effective upon approval by the voters, is self-executing, and no Legislative implementation is required.

(e)   If any part of this section is held invalid for any reason, the remaining portion or portions shall be severed from the invalid portion and given the fullest possible force and effect.

64.   As noted in the ballot summary for the proposed amendment, the express intention of the amendment was to ensure that "for casino gambling to be authorized under Florida law, it must be approved by Florida voters pursuant to Article XI, Section 3 of the Florida Constitution." *Advisory Op. to the Atty. Gen re: Voter Control of Gambling in Florida*, 215 So. 2d 1209, 1213 (Fla. 2017).

65.   The amendment defined "casino gambling" to include, among other things, blackjack, roulette, craps, slot machines, and electronic gambling devices. Fla. Const., art. X, § 30. Pari-mutuel wagering on horse racing, dog racing, or jai alai exhibitions are excluded from the definition of "casino gambling." But the amendment contemplated that other forms of gaming could also fall within the definition of "casino gambling" and expressly incorporated statutory and regulatory definitions under IGRA that make, among other things, sports betting class III gambling.

66.   Amendment 3 became effective upon voter approval on November 6, 2018 and was self-executing.

D.       **The 2021 Gaming Compact**

67.      Now facing public accountability and voter resistance to efforts to expanded gambling, the State of Florida attempted to shield sweeping gambling expansion from public review by burying it in a new Compact with the Seminole Tribe. Amendment 3 provides that "nothing herein shall be construed to limit the ability of the state or Native American tribes to *negotiate* gaming compacts pursuant to the Federal Indian Gaming Regulatory Act for the conduct of casino gambling on tribal lands, or to affect any *existing* gambling on tribal lands pursuant to compacts executed by the state and Native American tribes pursuant to IGRA." Fla. Const., art. X § 30.

68.      IGRA expressly requires compliance with state law for Class III gaming on tribal lands to be lawful. *See* 25 U.S.C. § 2710(d)(1).

69.      The Governor of Florida and the Seminole Tribe entered the 2021 Gaming Compact on April 23, 2021, and then amended it on May 17, 2021 (collectively, the "2021 Compact"). Exs. 1, 2. By its terms, the 2021 Compact superseded the 2010 Compact upon approval by the Florida Legislature and the Federal Department of Interior. *See* Ex. 1, Part II.F.

70.      Knowing that the 2021 Compact would likely face significant legal challenges, the State of Florida and the Seminole Tribe included an express severability clause that provides:

> In the event that a federal district court in Florida or other court of competent jurisdiction shall find any provision, section, or subsection of this Compact to be invalid, the remaining provisions of this Compact shall remain in full force and effect, provided that severing the invalidated provision, section or subsection does not undermine the overall intent of the parties in entering this Compact. However, except as set forth below, if either Part XI or Part XII is held by a court of competent jurisdiction to be invalid, this Company will become null and void at the option of either the Tribe or the State.

Ex. 1, Part XIV.

71.     Members of the Florida Legislature expressed doubts about the legality of the 2021 Compact. Chairman of Florida's House Select Committee on Gaming noted "Personally, I don't think this is going to survive." John Kennedy & Jim Rosica, *Sports Betting OK'd in Florida, Though Likely to Face Legal, Other Tests*, Tallahassee Democrat (May 19, 2021), https://www.tallahassee.com/story/news/local/state/2021/05/19/2-5-billion-compact-seminole-tribe-approved-lawmakers-still-faces-federal-legal-challenges/5162663001/

72.     The 2021 Compact and its Implementing Legislation contain many provisions that impermissibly permit unauthorized forms of gambling on tribal lands in violation of Florida law. The 2021 Compact and its Implementing Legislation allow the Seminole Tribe to offer craps, roulette, and sports betting—none of which is legal under Florida law. *See* 2021 Compact, Part III.F (defining "covered games"); Ch. 2021-268, § 2, Laws of Fla. The 2021 Compact also allowed the Seminole Tribe to add three additional gambling facilities in Hollywood, *See* Ex. 1, Part IV.D, and to offer "any new game authorized by Florida law for any person for any purpose." *Id.* at Part III.F.

73.     The 2021 Compact and its Implementing Legislation also expands Class III gaming beyond tribal lands by authorizing "hub and spoke" sports betting, while granting the Seminole Tribe exclusive rights over that Class III gaming. Sports betting, as defined by the 2021 Compact, includes wagers that originate from "a Patron physically located in the State *but not on Indian Lands* using an electronic device connected via the internet, web application or otherwise," and requires the Seminole Tribe to contract with non-tribal pari-mutuel permit holders to facilitate these bets. Ex. 1, Part III.CC.[7] Accordingly, the sports betting scheme—with the Seminole Tribe

---

[7] Sports betting under the 2021 Compact can begin as early as October 15, 2021. *See* Ex. 2. The Tribe has reportedly set a target implementation date of November 15, 2021.

as its "hub"—permits gambling through the Internet and mobile devices. As one Florida legislator noted, the 2021 Compact "allow[s] the Seminole Tribe to offer sports betting where you can be sitting in your bathtub or sitting on your couch, thinking about a football game and you can make a wager, *regardless of where you physically are, on your cell phone*."[8] In short, the 2021 Compact converts every smart phone, tablet, laptop, or desktop in Florida into a remote gambling device.

74.    Recognizing that the expansive "hub and spoke" sports betting scheme was problematic under federal gaming laws, the Seminole Tribe and the State included a provision in the 2021 Compact stating that off-reservation bets would be "deemed to take place exclusively where received at the location of the servers or other devices used to conduct such wagering activity at a Facility on Indian Lands." Ex. 1, Part IV.A.

75.    Not only does the 2021 Compact authorize off-reservation betting, it also permits interstate Internet sports betting in violation of federal law. The 2021 Compact repeatedly references "physically located within the State" but fails to adequately address how the Tribe will ensure that sports bettors meet this criterion. The 2021 Compact provides that for "wagers made with a mobile or other electronic device, the Tribe shall implement . . . geo-fencing to prevent wagers by players not physically located in the State." Ex. 1 at 19. But readily-downloadable software and apps enable computer and mobile device users to run Virtual Private Networks (VPNs) to bypass geo-restricted sites by faking a specific geographic location. And individuals who live close to the Florida border, in Georgia and Alabama where sports betting is illegal, may have IP addresses listed in Florida.

---

[8] Mary Ellen Klas & Ana Ceballos, *Florida Expands Gambling, Joins Ranks of Sports Betting States. But Hurdles Remain*, Miami Herald, May 19, 2021.

76.     The 2021 Compact specified an intent to grant the Seminole Tribe exclusivity "throughout the State, subject to the exceptions and provisions set forth [in the Compact] without State-authorized competition from other persons, organization or entities offering Class III Gaming or Other Casino-Style Gaming." Ex. 1, Part XII.

77.     Concurrently with the ratification of the 2021 Compact and consistent with the terms of the 2021 Compact, the Legislature without voter approval authorized the Seminole Tribe to engage in the following Class III games under the 2021 Compact—slot machines, certain card games,[9] craps, roulette, fantasy sports contests, and sports betting. Ch. 2021-268, § 2, Laws of Fla. Consistent with the exclusivity granted to the Seminole Tribe elsewhere in the Compact and the Implementing Legislation, the Legislature provided: "[g]ames and gaming activities authorized under this subsection and conducted pursuant to a gaming compact ratified and approved under subsection (3) do not violate the laws of this state."[10] *Id.* The Implementing Legislation also repeated the 2021 Compact's assertion that the location of the bets would be determined based on the location of the servers on Tribal lands. *Id.*

78.     Separately, the Florida Legislature passed additional legislation that substantially expanded permissible gambling without voter approval in violation of Amendment 3. *See* Ch.2021-271, Laws of Fla.[11] Consistent with the exclusivity granted to the Tribe elsewhere in the

---

[9] The 2021 Compact and the Implementing Legislation authorize banking or banked card games, including baccarat, chemin de fer, and blackjack, at tribal facilities in Broward, Collier, and Hillsborough Counties.

[10] The Legislature also expanded gambling in other ways. It broadened the conditions for operating a cardroom—allowing cardrooms in counties without slot machines to have significantly more tables than cardrooms in other counties, and allowing all cardrooms to operate 24 hours a day. *See* Ch.2021-268, § 6, Laws of Fla. It also expanded the definition of "pari-mutuel facility" to include "the grounds or property of a cardroom, racetrack, fronton, or other facility used by a licensed permitholder." Ch.2021-271, § 1, Laws of Fla.

[11] This wide-ranging legislation has been loosely referred to as the "Decoupling Legislation" because it allowed race tracks to have slot machines, even if no live racing is taking place. The

Compact and the Implementing Legislation, this "Decoupling Legislation" exempted the new

Class III gaming rights granted to the Seminole Tribe "pursuant to [the] gaming compact" from

certain Florida Statutes that govern gambling:

> *Sections 849.01, 849.08, 849.09, 849.11, 849.14, and 849.25 do not apply to participation in or the conduct of any of the following activities: (1) Gaming activities authorized under § 285.710(13) and conducted pursuant to a gaming compact* ratified and approved under § 285.710(3), (2) Amusement games conduct pursuant to chapter 546, (3) Pari-mutuel wagering conducted pursuant to chapter 550, (4) Slot machine gaming conducted pursuant to chapter 551, (5) Games conducted pursuant to § 849.086, (6) Bingo games conducted pursuant to § 849.0931.

*See* Ch.2021-271, § 36, Laws of Fla.

79.     Under the Decoupling Legislation, the "exempted" gambling activities, including

craps, roulette, and sports betting "conducted pursuant to [the] gaming compact," would no longer

be subject to Florida's general prohibition on gambling, § 849.08, Florida's criminalization of

betting on contests of skill, § 849.14, and Florida's criminalization of bookmaking, § 849.25. For

anyone engaged in sports betting other than through the Seminole Tribe, the Florida Legislature

increased the penalty for unlawful bets or wagers on contests of skill from a second degree

misdemeanor to a third degree felony. *See* Ch.2021-271, § 35, Fla. Laws.

80.     Under the terms of the 2021 Compact, the Seminole Tribe receives exclusive rights

to sports betting, craps, and roulette—none of which has been duly authorized by the procedures

required under Florida law. To the contrary, the grant of exclusivity recognizes that gaming is

unlawful elsewhere under existing State law. In exchange, the State of Florida stands to make at

least $2.5 billion in revenue sharing over the first five years of the 30-year agreement. Accordingly,

---

legislation amended numerous chapters of the Florida Statutes, including Chapter 550 governing pari-mutuel wagering, Chapter 551 governing slot machines, and Chapter 849 governing gambling.

state government has a deep-pocket interest in upholding this Compact, even if it conflicts with federal law, state law, and Plaintiffs' constitutionally protected interests.

### E.    DOI Review of the 2021 Compact

81.    Under IGRA, a negotiated compact must be submitted to DOI for review, and DOI has 45 days to determine whether to approve or disapprove it. *See* 25 U.S.C. § 2710(d)(8). If DOI takes no action before the 45 days, the compact "shall be considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of [IGRA]." *Id.*

82.    The Governor of Florida and the Seminole Tribe submitted the 2021 Compact and related documents to DOI on June 21, 2021, and therefore DOI had until August 5, 2021 to conduct its review.

83.    In prior interpretations of IGRA, the federal government had repeatedly taken the position that IGRA did not authorize gambling off Indian lands, and more specifically, that bets transmitted off Indian lands constitute off-reservation gaming:

      a.    In an Amicus Brief submitted in connection with opposing online gaming, the United States noted that "'wagering,' 'gambling,' or gaming' occur in both the location from which a bet, or 'offer,' is tendered and the location in which the bet is accepted or received." Brief for the United States as Amicus Curiae Supporting Appellee, No. 99-35088, *AT&T Corp. v. Coeur d'Alene Tribe*, 295 F.3d 899 (9th Cir. 2002), 1999 WL 33622333 at *12-14.

      b.    The National Indian Gaming Commission, an agency within DOI, independently concluded, "The use of the Internet, even though the computer server may be located on Indian lands, would constitute off-reservation gaming to the extent any of the players were located off of Indian lands. *See* Letter from Kevin Washburn, General Counsel, NIGC, to Joseph Speck, Nic-A-Bob Productions, re: WIN Sports Betting Game (Mar. 13, 2001) ("The use of the Internet, even though the computer server may be located on Indian lands, would constitute off-reservation gaming to the extent any of the players were located off Indian lands.")

      c.    In *California v. Iipay Nation of Santa Ysabel*, the United States and California successfully sued a Tribe for taking wagers that originated off Indian lands in violation of federal law. 898 F.3d 960, 967 (9th Cir. 2018).

84.     Private Florida residents and Florida municipal government representatives wrote to DOI to express significant concerns regarding the 2021 Compact and to urge the Secretary to disapprove it based on violations of federal and state law. Exs. 3-4.

85.     No Casinos wrote to DOI on June 9, 2021. The letter noted No Casino's "long-held belief that it is in the best interests of the Tribe and the State to have a compact that honors Tribal rights, state and federal law and the will of the people." Ex. 3 at 2. It then described in detail a number of "critical flaws" in the 2021 Compact that were contrary to all of those important interests. First, the 2021 Compact violates several federal laws, including IGRA, the Wire Act, and the UIGEA by authorizing Class III wagering outside of Indian lands. Second, the 2021 Compact violates state law and the will of Florida's people because Florida's Constitution "specifically prohibits casino gambling games not already permitted through a vote of the People." Ex. 3 at 4. And third, the 2021 Compact was inconsistent with the intent of the IGRA because it sought to "enrich non-tribal" interests rather than "protect the sovereign rights and interests of Native American Tribes and Peoples." *Id.*

86.     Dan Gelber, Mayor of the City of Miami Beach, Florida, also expressed his strong opposition to the 2021 Compact. In a letter dated June 3, 2021, Mayor Gelber noted that the "Florida Compact you are considering was not crafted in pursuit of [the] goals [of IGRA]." Ex. 4 at 1. He detailed how numerous casino interests infiltrated the compact negotiations to advance their own interests in circumventing the Florida Constitution's requirement for voter approval of casino gambling expansion.

87.     On August 6, 2021, DOI notified the Governor of Florida that "[a]fter thorough review under IGRA, we have taken no action to approve or disapprove the Compact before the

August 5 deadline. As a result, the Compact is considered to have been approved by operation of law to the extent that it complies with IGRA and existing Federal law." Ex. 5 at 1.

88.     The DOI "no action" letter did not reference any of the letters received from private and local government interests, and there is no indication that DOI considered the concerns raised therein.

89.     The DOI letter failed to analyze the UIGEA or the Wire Act, both of which were specifically addressed in the letters raising concerns about the 2021 Compact.

90.     The DOI letter recognized that, under the 2021 Compact: "The Tribe is also authorized to conduct the following new games: craps, including dice games such as sic-bo and any similar variations; roulette, including big six and any similar variations; sports betting (at casinos and on mobile devices); and fantasy sports contests (if authorized by future legislation)." Ex. 5 at 3. The DOI then recognized: "The Tribe will obtain exclusivity for offering craps, roulette and similar games (with a limited exception)." *Id.*[12]

91.     The DOI also recognized the 2021 Compact and its implementing legislation permitted the Tribe to offer mobile sports betting that would operate at least statewide on an exclusive basis:

> *The Compact* authorizes the Tribe to continue to conduct class III gaming on its lands and *expands the allowable scope of gaming to include mobile sports betting*, amongst other games. *The Tribe may conduct and operate sports books to offer sports betting on professional and collegiate sport events through mobile or electronic devices by patrons physically located within the State*. Compact, Part III.CC.1-2. Pursuant to the Compact and State law, such wagering is deemed to be exclusively conducted by the Tribe at the location of the servers that process such wagering activity on the Tribe's Indian lands. Id.; Part IV.A; Part III.CC.2. "Sports Betting" is defined as wagering on past or future professional sports or athletic

---

[12] The limited exception to exclusivity for Table Games is"[e]xpanded gaming conducted pursuant to an amendment to the Florida Constitution approved by an initiative pursuant to Article XI, § 3 that is funded in whole or in party by the Tribe." Ex. 1 at 62. No such amendment has been proposed, and therefore no one else in Florida can operate craps or roulette.

> event or contest, Olympic sport or international event, any collegiate sport or motor vehicle race, but not proposition bets on collegiate sports. Id. Part III.CC.

> The Tribe and State refer to this arrangement as a "hub and spoke" model, where the Tribe's servers are the hub, and the spokes are the mobile devices and contracted Qualified Pari-mutuel Permitholders facilities where the wagers originate. *The State legislature authorized mobile sports betting exclusively for the Tribe* through legislation enacted at the same time it ratified the Compact….

Ex. 5 at 2. But the Tribe has never explained why or how mobile sports betting would be limited to individuals within the State of Florida; as explained above, ¶¶ 74-75, such limits are not technically possible. As a Florida legislator put it: "you can be sitting in your bathtub or sitting on your couch, thinking about a football game and you can make a wager, *regardless of where you physically are, on your cell phone.*" *House Legislators Approve Deal that Grants Seminole Tribe Expanded Gambling Rights in Florida–Includes Roulette, Craps, and Sports*, Florida Insider (May 19, 2021) [https://floridainsider.com/business/house-legislators-approve-deal-that-grants-seminole-tribe-expanded-gambling-rights-in-florida-includes-roulette-craps-and-sports/](https://floridainsider.com/business/house-legislators-approve-deal-that-grants-seminole-tribe-expanded-gambling-rights-in-florida-includes-roulette-craps-and-sports/).

92.     In reciting what it perceived as benefits to the Tribe, the DOI emphasized exclusivity: "The State is offering the Tribe state-wide exclusivity for sports betting, exclusivity for new table game[s], and fantasy sports contests (if authorized by future legislation)." Ex. 5 at 8. The DOI also stated: "the State's concession of class III gaming exclusivity to the Tribe is considered a meaningful concession." *Id.*

93.     Despite opining extensively on the 2021 Compact itself and implementing legislation, the DOI made zero mention of Amendment 3, now included in the Florida Constitution as Article X, § 30. The DOI noted, "both the Compact and the State law authorize the Tribe to engage in mobile sports betting," Ex. 5 at 7, but did not address Florida's requirement of "voter control of gambling," its requirement that "citizens' initiatives [be] the exclusive method of authorizing casino gambling," or any other language in Amendment 3.

94.     The DOI expressed "concern" regarding the provisions of the 2021 Compact that requires the Seminole Tribe to enter marketing agreements with non-tribal interests to facilitate sports betting. But it refused to disapprove this provision, despite noting several questions about its legality, and that "DOI does not endorse the marketing agreement arrangement provided in the Compact." Ex. 5 at 12.

95.     As for state law more generally, the DOI asserted that it did not have statutory authorization to consider issues of state law in its review. It therefore, "relied on the representations of the Governor of Florida that the gaming was properly authorized," and incorrectly concluded that "any concern surrounding the State's authorization of sports betting is outside the scope of the Department's review." *Id.* at 5-6, n.8.

96.     The 2021 Compact was officially deemed approved when notice of approval was published in the Federal Register. *See* 86 Fed. Red. 44037 (Aug. 11, 2021).

97.     In a press release issued in the wake of the DOI approval, the Governor described the 2021 Compact as "the largest gaming compact in history, [which] will generate a minimum of $2.5 billion in new revenue to the state over the next five years and an estimated $6 billion through 2030." The press release also noted that pari-mutuel facilities would have "the opportunity to participate in sports betting offered by the Tribe." In that same press release, the Chairman of the Seminole Tribe of Florida was quoted as saying that the Compact would result in "statewide sports betting and new casino games that will roll out this fall."[13] Again, the Chairman failed to explain why or how sports betting on computers and mobile devices would be limited to the State of Florida and not be used on devices in states that ban sports betting.

---

[13] Press Release, *Governor Ron DeSantis Celebrates Approval of Historic Gaming Compact with Seminole Tribe of Florida* (Aug. 6, 2021), https://www.flgov.com/2021/08/06/governor-ron-desantis-celebrates-approval-of-historic-gaming-compact-with-seminole-tribe-of-florida/.

### F.   Federal Litigation Challenging Sports Betting

98.   On July 2, 2021, a group of plaintiffs collectively referring to themselves as "Southwest Pari-mutuels" filed a lawsuit in the United States District Court for the Northern District of Florida against Florida's Governor DeSantis and Florida's Department of Business and Professional Regulation Secretary Julie Imanuel Brown seeking declaratory and injunctive relief. *West Flagler Assocs., Ltd. et al. v. DeSantis et al*., No. 4:21-cv-00270 (N.D. Fla. filed July 2, 2021). They assert that the 2021 Compact violates federal law because, among other things, the online sports betting provisions authorize off-reservation sports betting by individuals who are not physically present on Indian lands. *West Flagler*, No. 4:21-cv-00270, DE 1 ¶ 3.

99.   In their complaint, the Southwest Pari-mutuels acknowledge that they are direct competitors of the Seminole Tribe, and allege various injuries they will suffer because of the 2021 Compact's sports betting provisions. According to the Southwest Pari-mutuels, "the 2021 Compact and Implementing Law prohibit pari-mutuels and others from offering sports betting unless they enter into an agreement with the [Seminole] Tribe." *Id.* ¶ 131. They further allege that the 2021 Compact will adversely affect the Southwest Pari-mutuels' revenues. *Id.* ¶¶ 138-142. In other words, they sued because they seek to broaden sports betting and because the 2021 Compact's exclusivity provisions threaten their pari-mutuel operations.

100.   The Southwest Pari-mutuels' complaint identifies a number of legal and constitutional questions in connection with the so-called "hub and spoke" model of sports betting authorized by the 2021 compact. *Id.* ¶ 124. Although the Southwest Pari-mutuels repeatedly reference Amendment 3 and the "open question" of whether the sports betting provisions violate that provision of the Florida Constitution, they do not assert a legal claim based on Amendment 3.

They also do not challenge other sweeping expansions of gambling, including craps and roulette, which the State authorized solely through the 2021 Compact, without a citizens' initiative.[14]

### G.   Federal Litigation Challenging DOI "Approval" of the 2021 Compact

101.   In addition to seeking declaratory and injunctive relief against the State of Florida, the Southwest Pari-Mutuels have also sued the DOI in the United States District Court for the District of Columbia. *West Flagler Assoc., Ltd. et al. v. Haaland et al.*, No. 1:21-cv-02192 (D.D.C. filed August 16, 2021) ("Pari-Mutuel DOI Action"). The Southwest Pari-Mutuels sued the DOI and Secretary days after the DOI issued its letter declining to take action on the 2021 Compact.

102.   The Pari-Mutuel DOI Action raises many of the same legal issues asserted in the pending federal litigation against the State of Florida. According to the Southwest Pari-mutuels, the DOI's "approval" of the 2021 Compact by operation of law was "arbitrary and capricious, unlawful and *ultra vires*" in light of the legal infirmities of the 2021 Compact. *West Flagler Assoc., Ltd. et al. v. Haaland et al.*, No. 1:21-cv-02192 (D.D.C. filed August 16, 2021).

103.   Much like the Florida federal litigation, the Pari-Mutuel DOI Action focuses solely on the hub and spoke theory as a violation of IGRA and other federal law. The Pari-Mutuel DOI Action does not address Amendment 3 or any of the sweeping expansions of gambling sought to be implemented through the 2021 Compact. The state laws are critical to any analysis of a compact's validity under IGRA.

---

[14] One of the Southwest Pari-mutuels plaintiffs, West Flagler Associates, Ltd., owns and operates Magic City Casino—a licensed pari-mutuel facility in Miami, Florida. West Flagler also sought to bring gambling to the Edgewater neighborhood of Miami in contravention of Miami's Zoning Code and Comprehensive Neighborhood Plan. Under a settlement agreement between West Flagler and the City of Miami, West Flagler expressly agreed to forgo craps and roulette at its proposed Edgewater location, but specifically reserved the right to seek approval for sports betting if it became legal under Florida law.

104.     Unlike the Florida federal litigation, the Pari-Mutuel DOI Action asserts claims under the Administrative Procedure Act. *Compare West Flagler Assocs., Ltd. et al. v. DeSantis et al.*, No. 4:21-cv-00270 (N.D. Fla. filed July 2, 2021) (asserting claims for declaratory and injunctive relief) *with West Flagler Assoc., Ltd. et al. v. Haaland et al.*, No. 1:21-cv-02192 (D.D.C. filed August 16, 2021) (asserting violations of the Administrative Procedure Act and the Fifth Amendment).

## CAUSES OF ACTION

### COUNT 1
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
#### Unlawful Final Determination (5 U.S.C. §§ 704, 706(2))

105.     Plaintiffs incorporate by reference each allegation contained in the preceding paragraphs 1 through 104.

106.     Defendants' determination to take "no action" on the 2021 Compact constitutes final agency action reviewable under § 704 and § 706 of the Administrative Procedure Act.

107.     Plaintiffs have suffered a legal wrong due to the DOI's determination, and are therefore entitled to judicial review. Because of the DOI's erroneous determination, the State of Florida and the Seminole Tribe will significantly expand gambling inside and outside of Indian lands, without voter approval. As a result, Plaintiffs' properties will be adversely affected by, among other things, increasing neighborhood traffic, increasing neighborhood congestion, increasing criminal activity, reducing open spaces, and reducing property values. Plaintiffs have also lost the opportunity to oppose such expansion of gambling through the constitutionally required citizens' amendment process.

108.     Plaintiffs have no other adequate remedy in court.

109.     The DOI's final determination is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because it is inconsistent with the text, structure, purpose,

and history of the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 *et seq.*, the Wire Act, 18 U.S.C. §§ 1801 *et seq.*, the Unlawful Internet Gambling Enforcement Act ("UIGEA"), 31 U.S.C. §§ 5361 *et seq.*, and Florida law.

110.    Congress intended IGRA "to ensure that the Indian tribe is the primary beneficiary of the gaming operation." 25 U.S.C. § 2702(2). Moreover, IGRA requires that an Indian tribe have "sole proprietary interest and responsibility for the conduct of any gaming activity." 25 U.S.C. § 2710(b)(2)(A).

111.    The sports betting provisions of the 2021 Compact implement a "hub and spoke" model that allows non-tribal, participating pari-mutuel facilities ("Pari-Mutuel Partners") to impermissibly share in the interest and responsibility for conducting sports betting throughout Florida outside of Indian lands. In violation of IGRA, the Pari-Mutuel Partners will have substantial involvement in the sports betting operations, including the responsibility "to perform marketing or similar services" and the ability to provide "dedicated areas within their facilities where Patrons may access or use electronic devices to place wagers." Ex. 1 at 15, 17. Each Pari-Mutuel Partner also stands to significantly benefit from the sports betting operations, to the tune of at least 60% of the difference between the Seminole Tribe's "Net Win" on sports betting through the Pari-mutuel Partner and the "reasonable and proportionate share of all expenses incurred by the [Seminole] Tribe in operating and conduction such wagering" via the Pari-Mutuel Partner. Ex. 1 at 16-17.

112.    IGRA does not authorize gaming outside of Indian lands.

113.    The 2021 Compact violates IGRA by unlawfully authorizing off-reservation sports betting through a "hub and spoke" model that allows individuals to place bets anywhere in the

State of Florida, and requires the Seminole Tribe to contract with Pari-Mutuel Partners to facilitate these bets, which are not placed and do not originate "on Indian lands."

114.     IGRA permits state involvement in regulating gaming on Indian lands, but it does not allow state legislators to circumvent constitutional law governing gambling.

115.     Under IGRA, "Class III gaming activities shall be lawful *on Indian lands* only if such activities are: (A) authorized by [a tribal] ordinance or resolution . . . , (B) located in a State that permits such gaming for any purpose by any person, organization, or entity, and (C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect." 25 U.S.C. § 2710(d)(1).

116.     Under Amendment 3 to Florida's Constitution, a citizens' initiative is the sole method for approving the expansion of casino gambling in the State.

117.     The 2021 Compact violates IGRA by granting the Seminole Tribe exclusive rights to engage in craps and roulette, meaning that the gambling rights granted to the Seminole Tribe are not permitted for any purpose by any other person, organization, or entity.

118.     Craps and roulette are not and have never been lawful in Florida. The 2021 Compact, the Implementing Legislation, and the Decoupling Legislation purport to authorize craps and roulette without voter approval. Such significant expansion of gambling violates Amendment 3.

119.     Sports betting is not and has never been lawful in Florida. The 2021 Compact, the Implementing Legislation and the Decoupling Legislation purport to authorize the Seminole Tribe and its Pari-Mutuel Partners to engage in this form of gambling activity without voter approval, in violation of Amendment 3.

120.    Secretary Haaland and DOI unlawfully approved the 2021 Compact, even though the 2021 Compact violates numerous provisions of federal law. DOI is statutorily authorized to disapprove a Compact that violates IGRA or "any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands." 25 U.S.C. § 2710(d)(8)(B).

121.    As explained above, ¶¶ 61-80, the 2021 Compact, Implementing Legislation, and Decoupling Legislation violate Florida law, most notably Amendment 3 of the Florida Constitution and are therefore unlawful under IGRA.

122.    The 2021 Compact violates the Wire Act, which makes it illegal for anyone "engaged in the business of betting or wagering [to] knowingly use[] a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest . . . ." 18 U.S.C. § 1084(a).

123.    The 2021 Compact violates the UIGEA, which makes it illegal for anyone "engaged in the business of betting or wagering" to knowingly accept certain specified types of funds "in connection with the participation of another person in unlawful Internet gambling." 31 U.S.C. § 5363. "Unlawful internet gambling" is defined to include bets or wagers that are "unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made." 31 U.S.C. § 5362(10).

124.    The 2021 Compact unlawfully authorizes wagering through the Internet, including through computers and mobile phones, which necessarily involves interstate wire and cellular transmissions, even if the transactions purport to originate in Florida. The 2021 Compact also enables wagering through the Internet and offers no mechanism to prohibit individuals to place bets outside of Florida in other states, such as Alabama and Georgia, that prohibit sports gambling.

125.    In approving the Compact by operation of law, Secretary Haaland and DOI failed to consider relevant factors including, but not limited to, the UIGEA, the Wire Act, Florida law prohibiting gaming, and Amendment 3, which the federal laws at issue here incorporate.

126.    Defendants' approval of the 2021 Compact frustrates and undermines the basic purposes and policy goals of IGRA, the Wire Act, the UIGEA, and Amendment 3 to Florida's Constitution.

127.    WHEREFORE, Plaintiffs request an order, pursuant to 5 U.S.C. § 706(2), setting aside Defendants' unlawful determination that the 2021 Compact is approved.

## COUNT 2
## DECLARATORY AND INJUNCTIVE RELIEF

128.    Plaintiffs incorporate by reference each allegation contained in the preceding paragraphs 1 through 104.

129.    This claim is brought under 28 U.S.C. §§ 2201, 2202.

130.    An actual, present, and justiciable controversy has arisen between Plaintiffs, Secretary Haaland, and DOI concerning the scope of permissible gambling in Florida, and whether DOI can approve a compact that authorizes various forms of gambling that are otherwise unlawful in the State, in contravention of IGRA, the Wire Act, the UIGEA, and Florida's Constitution.

131.    Absent declaratory relief, Plaintiffs are in significant doubt as to the enforceability of the DOI approval, which violates federal and state law.

132.    The DOI approval directly and immediately adversely affects the Plaintiffs and their properties, including the opportunity to challenge the unprecedented attempt to expand gambling within the State of Florida.

133.    Plaintiffs have suffered a special injury different from the injuries to other citizens, residents, and taxpayers. By unlawfully authorizing off-reservation sports betting and other

36

unlawful forms of gambling, the Defendants' actions impact properties near the Hard Rock Casino by, among other things, increasing neighborhood traffic, increasing neighborhood congestion, increasing criminal activity, reducing open spaces, and reducing property values.

134.    Absent a declaration of rights, Plaintiffs have no adequate remedy at law to resolve any doubt as to their right to protect their properties and to challenge the DOI approval.

135.    The requested declaratory judgment is consistent with the public interest and does not unfairly prejudice any parties or the public.

136.    For all these reasons and other reasons to be developed, Plaintiffs seek a declaration that the 2021 Compact violates IGRA, the Wire Act, the UIGEA, and Florida law, and therefore should be disapproved. Plaintiffs further seek all available supplemental relief.

137.    Plaintiffs are also entitled to injunctive relief. They have a strong likelihood of success on the merits, given that the 2021 Compact allows gambling inconsistent with Florida and federal law. Plaintiffs have no available remedy at law, with a very real likelihood of irreparable harm absent relief. The public interest favors granting of an injunction enjoining the DOI's approval of the 2021 Compact.

138.    WHEREFORE, Plaintiffs request an order declaring that the 2021 Compact violates IGRA, the Wire Act, the UIGEA, and Florida's Constitution, and therefore should have been disapproved by DOI.

## PRAYER FOR RELIEF

139.    Plaintiffs request the following relief:

    a.    An order setting aside defendants' unlawful approval of the 2021 Compact;

    b.    An order declaring that the 2021 Compact, the Implementing Legislation, and the Decoupling Legislation violate IGRA, the Wire Act, the UIGEA, and Article X, Section 30 of Florida's Constitution;

    c.    An order preliminarily enjoining the DOI's approval of the 2021 Compact;

d.   An order, under 28 U.S.C.§ 2412, awarding Plaintiffs their costs and reasonable attorneys' fees incurred in bringing this action; and

e.   Any and all further relief as the Court may deem just and proper.

Respectfully submitted:

_/s/ Glenn Burhans_
Glenn Burhans, Jr., FL Bar No. 605867*
gburhans@stearnsweaver.com
Robert J. Walters, FL Bar No. 1024733*
rwalters@stearnsweaver.com
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON PA
Highpoint Center
106 East College Avenue, Suite 700
Tallahassee, FL 32301
(850) 329-4850

_/s/ Eugene E. Stearns_
Eugene E. Stearns, FL Bar No. 0149335*
estearns@stearnsweaver.com
Grace L. Mead , FL Bar No. 49896*
gmead@stearnsweaver.com
Jenea M. Reed , FL Bar No. 84599*
jreed@stearnsweaver.com
Coral Del Mar Lopez, FL Bar No. 1022387*
clopez@stearnsweaver.com
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
150 West Flagler Street, Suite 2200
Miami, Florida  33130
(305) 789-3200
_* Pro hac vice applications forthcoming_

_/s/ Eli J. Kay-Oliphant_
Eli J. Kay-Oliphant, D.C. Bar No. 503235
eli.kay-oliphant@sparacinopllc.com
Ryan R. Sparacino, D.C. Bar No. 493700
ryan.sparacino@sparacinopllc.com
SPARACINO PLLC
1920 L Street, NW, Suite 535
Washington, D.C.  20036
(202) 629-3530

38