**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MONTERRA MF, LLC, et al., | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) Civil Action No. 1:21-cv-02513-DLF |
| | ) |
| DEB HAALAND, in her official capacity as | ) |
| Secretary of the United States Department of | ) |
| The Interior, et al., | ) |
| | ) |
| *Federal Defendants.* | ) |
| | ) |
| | ) |

## APPENDIX

Pursuant to Local Civil Rule 7(n)(1), Federal Defendants Deb Haaland, in her official

capacity as Secretary of the Interior, and the United States Department of the Interior, by and

through their undersigned counsel, hereby submit this Appendix containing excerpts from the

Administrative Record cited in *Federal Defendants' Supplemental Memorandum*, filed

concurrently herewith.

Respectfully submitted this 9th day of November, 2021.

<div style="margin-left: 45%;">

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
*/s/ Rebecca M. Ross*
REBECCA M. ROSS, Trial Attorney
HILLARY K. HOFFMAN, Trial Attorney
Indian Resources Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044
Telephone:  (202) 616-3148
rebecca.ross@usdoj.gov
hillary.hoffman@usdoj.gov
*Attorneys for Federal Defendants*

</div>

OF COUNSEL:
JODY H. SCHWARZ
Senior Attorney
Office of the Solicitor
Division of Indian Affairs

## CERTIFICATE OF SERVICE

I, Rebecca M. Ross, hereby certify that on November 9, 2021, I caused the foregoing

APPENDIX to be sent electronically to the registered participants as identified on the Notice of

Electronic Filing.

/s/ *Rebecca M. Ross*
REBECCA M. ROSS, Trial Attorney
Indian Resources Section
Environment and Natural Resources Division
United States Department of Justice

# SEMINOLE TRIBE OF FLORIDA

**MARCELLUS OSCEOLA, JR.**
*Chairman*
*6300 Stirling Road Suite 420*
*Hollywood, Florida 33024*
*(954) 966-6300 Ext 11401*
*E-MAIL:*
*marcellusosceola@semtribe.com*
*WEBSITE:*
*http://www.seminoletribe.com*



*Tribal Officers:*
**MITCHELL CYPRESS**
*Vice-Chairman*
**LAVONNE ROSE**
*Secretary*
**PETER HAHN**
*Treasurer*

**RECEIVED**
**JUN 2 1 2021**
AS - IA
Office of Indian Gaming

June 21, 2021

Via Hand Delivery

Ms. Paula Hart
Director, Office of Indian Gaming
U.S. Department of the Interior
1849 C St., N.W.
Mail Stop 3543
Main Interior Building
Washington, DC 20240

   Re: Seminole Tribe of Florida – 2021 Gaming Compact

Dear Ms. Hart:

   In accordance with 25 C.F.R Part 293, enclosed for review and approval by the Secretary of the Interior is an executed gaming compact between the Seminole Tribe of Florida (Tribe) and the State of Florida (State) dated April 23, 2021, and amended on May 13, 2021. Both the Governor of the State and the Chairman of the Tribal Council have affirmed their respective authority to execute the agreement in Part XIX of the 2021 Compact. Also, enclosed are: (1) a copy of a resolution adopted by the Tribal Council of the Tribe which certifies that the 2021 Compact and amendment have been approved in accordance with applicable tribal law, (2) a copy of legislation enacted by the Florida Legislature and signed by the Governor which ratifies the 2021 Compact and amendment for purposes of Florida law and (3) an overview of key changes compared to the 2010 Compact. As requested, the Tribe will submit separately an economic justification for the exclusivity payments required by the 2021 Compact.

   Please contact Jim Shore, General Counsel, if you have any questions. Mr. Shore can be reached at (954) 967-3950. In addition, we respectfully request a meeting with Mr. Bryan Newland, Principal Deputy Assistant Secretary – Indian Affairs, and your office to discuss the 2021 Compact. Thank you for your assistance.

       Sincerely,

       Marcellus W. *Osceola*, Jr.
       Chairman of the Tribal Council

**"BUT I HAVE PROMISES TO KEEP & MILES TO GO BEFORE I SLEEP"**



# SEMINOLE TRIBE OF FLORIDA

Enclosures
compactchair06-16-21

cc:    Governor Ron DeSantis
       James Uthmeier, Esq.
       Jim Shore, Esq.
       Joseph H. Webster, Esq.

2

AR016

# Compact

AR017

**RECEIVED**

JUN 21 2021

AS - IA
Office of Indian Gaming





# Compact Between the

# SEMINOLE TRIBE
# OF FLORIDA

## and the

# STATE OF FLORIDA

# 2021 Gaming Compact Between the Seminole Tribe of Florida and the State of Florida

## Table of Contents

| | | Page |
|---|---|---|
| Part I | Title | 1 |
| Part II | Recitals | 1 |
| Part III | Definitions | 3 |
| Part IV | Authorization and Location of Covered Games | 20 |
| Part V | Rules and Regulations; Minimum Requirements for Operations | 22 |
| Part VI | Patron Disputes; Workers Compensation; Tort Claims; Prize Claims; Limited Consent to Suit | 30 |
| Part VII | Enforcement of Compact Provisions | 35 |
| Part VIII | State Monitoring of Compact | 38 |
| Part IX | Jurisdiction | 45 |
| Part X | Licensing | 45 |
| Part XI | Payments to the State of Florida | 45 |
| Part XII | Grant of Exclusivity; Reduction of Tribal Payments Because of Loss of Exclusivity or Other Changes in Florida Law | 54 |
| Part XIII | Dispute Resolution | 64 |
| Part XIV | Construction of Compact; Severance; Federal Approval | 66 |
| Part XV | Notices | 68 |
| Part XVI | Effective Date and Term | 69 |
| Part XVII | Amendment of Compact and References | 70 |
| Part XVIII | Miscellaneous | 70 |
| Part XIX | Execution | 74 |

AR019

### 2021 Gaming Compact Between the Seminole Tribe of Florida and the State of Florida

This 2021 Compact is made and entered into by and between the Seminole Tribe of Florida, a federally-recognized Indian Tribe, and the State of Florida, with respect to the operation of Covered Games, as defined herein, on the Tribe's Indian Lands as defined by the Indian Gaming Regulatory Act.

Part I.  TITLE

This document shall be referred to as the "2021 Gaming Compact Between the Seminole Tribe of Florida and the State of Florida."

Part II.  RECITALS

A.     The Seminole Tribe of Florida is a federally-recognized tribal government possessing sovereign powers and rights of self-government.

B.     The State of Florida is a state of the United States of America possessing the sovereign powers and rights of a state.

C.     The State of Florida and the Seminole Tribe of Florida maintain a government-to-government relationship.

D.     The United States Supreme Court has long recognized the right of an Indian Tribe to regulate activity on lands within its jurisdiction, but the United States Congress, through the Indian Gaming Regulatory Act, has given states a role in the conduct of tribal gaming in accordance with negotiated tribal-state compacts.

E.     Pursuant to the Seminole Tribe Amended Gaming Ordinance, adopted by Resolution No. C-195-06, and approved by the Chairman of the National Indian Gaming

Seminole Compact
Page 2

Commission on July 10, 2006, as may be amended from time to time, hereafter referred to as the Seminole Tribal Gaming Code, the Seminole Tribe of Florida desires to offer the play of Covered Games, as defined in Part III of this Compact, as a means of generating revenues for purposes authorized by the Indian Gaming Regulatory Act, including without limitation the support of tribal governmental programs, such as health care, housing, sewer and water projects, police, fire suppression, general assistance for tribal elders, day care for children, economic development, educational opportunities, per capita payments to tribal members, and other typical and valuable governmental services and programs for tribal members.

F.     The Tribe and the State entered into a tribal-state compact pursuant to the Indian Gaming Regulatory Act on April 7, 2010 ("2010 Compact"). The 2010 Compact was subsequently approved by the Secretary of the Interior. 75 Fed. Reg. 38,833 (July 6, 2010). Unless this Compact is not approved by the Florida Legislature and the U.S. Secretary of the Interior or is invalidated by court action or change in federal law, this Compact supersedes the 2010 Compact, and the 2010 Compact shall no longer remain in effect. In the event that this Compact is not approved by the Florida Legislature and the U.S. Secretary of the Interior or is invalidated by court action or change in federal law, the 2010 Compact shall remain in effect.

G.     The voters of Florida approved a constitutional amendment at the 2018 General Election (Amendment 3) which created Article X, s. 30 of the Florida Constitution.

H.     The Tribe and the State affirm that it is in the best interests of the Tribe and the State for the State to enter into this Compact. The Compact recognizes the

Seminole Compact
Page 3

Tribe's right to offer certain forms of Class III Gaming and provides significant,

additional substantial exclusivity for such activities in return for a reasonable revenue

sharing arrangement between the Tribe and the State that will entitle the State to

significant, additional revenue participation.

I.      The Tribe and the State affirm that this Compact, and the operation of

Covered Games as authorized pursuant to this Compact, comply in all respects with the

Florida Constitution.

J.      The Tribe and the State affirm their belief that this Compact embodies an

unprecedented level of cooperation between a state and a sovereign government, which

benefits the long-term economic and social well-being of both the State and the Tribe.


Part III. DEFINITIONS

As used in this Compact:

A.      "Annual Oversight Assessment" means the amount for reimbursement to

the State for the actual and reasonable costs of the State Compliance Agency to perform

its monitoring functions set forth under the Compact.

B.      "Bingo Game" has the same meaning as in s. 849.0931(1)(a), Florida

Statutes, as in effect on January 1, 2021.

C.      "Class III Gaming" means the forms of Class III gaming defined in 25

U.S.C. s. 2703(8), and by the regulations of the National Indian Gaming Commission or

any successor commission.

AR022

Seminole Compact
Page  4

D.      "Commission" means the Seminole Tribal Gaming Commission, which is

the tribal governmental agency that has the authority to carry out the Tribe's regulatory

and oversight responsibilities under this Compact.

E.      "Compact" means this 2021 Gaming Compact between the Seminole

Tribe of Florida and the State of Florida, as the same may be amended or supplemented

in accordance with its terms.

F.      "Covered Game" or "Covered Gaming Activity" means only the

following:

1.      Slot Machines.

2.      Raffles and Drawings.

3.      Table Games.

4.      Fantasy Sports Contest(s).

5.      Sports Betting.

6.      Any new game authorized by Florida law for any person for any

purpose.

G.      "Covered Game Employee" or "Covered Employee" means any individual

employed and licensed by the Tribe whose responsibilities include the rendering of

services with respect to the operation, maintenance or management of Covered Games,

including, but not limited to, the following:  managers and assistant managers; accounting

personnel; Commission officers; surveillance and security personnel; cashiers,

supervisors, and floor personnel; cage personnel; and any other employee whose

employment duties require or authorize access to areas of the Facility related to the

conduct of Covered Games or the technical support or storage of Covered Game

components.  This definition does not include the Tribe's elected officials provided that such individuals are not directly involved in the operation, maintenance, or management of Covered Games or Covered Game components.

H.    "Documents" means books, records, electronic, magnetic and computer media documents and other writings and materials, copies thereof, and information contained therein.

I.    "Effective Date" means the date on which this Compact becomes effective pursuant to Part XVI, Section A of this Compact.

J.    "Electronic Bingo Card Minder" means a card minding device, which may only be used in connection with a Bingo Game and which is certified in advance by an Independent Testing Laboratory approved by the Division of Pari-Mutuel Wagering, or any successor agency, as a bingo aid device that meets each of the following requirements:

   1.    The device must aid a Bingo Game player by: (1) storing in the memory of the device not more than three (3) bingo faces of tangible bingo cards, as defined by s. 849.0931(1)(b), Florida Statutes, as of January 1, 2021, purchased by a player; (2) comparing the numbers drawn and then individually entered into the device by the player to the bingo faces previously stored in the memory of the device; and (3) identifying preannounced winning bingo patterns marked or covered on the stored bingo faces.

   2.    The device must not be capable of accepting or dispensing any coins, currency, or tokens.

Seminole Compact
Page 6

3.      The device must not be capable of monitoring any bingo card face
other than the faces of the tangible bingo card or cards purchased by the
player for that game.

4.      The device must not be capable of displaying or representing the
game result through any means other than highlighting the winning
numbers marked or covered on the bingo card face or giving an audio alert
that the player's card has a prize-winning pattern.  No casino game
graphics, themes or titles, including but not limited to depictions of slot
machine-style symbols, cards, craps, roulette, or lotto may be used.

5.      The device must not be capable of determining the outcome of any
game.

6.      Progressive prizes in excess of two thousand five hundred dollars
($2,500) are prohibited.

7.      Other than progressive prizes not to exceed two thousand five
hundred dollars ($2,500), no prize exceeding one thousand dollars
($1,000) may be awarded.

8.      No Electronic Bingo Card Minder may contain more than one
player position for playing bingo.

9.      No Electronic Bingo Card Minder may contain or be linked to
more than one video display.

10.     Prizes must be awarded based solely on the results of the bingo
game.  No additional element of chance may be used.

Seminole Compact
Page 7

K.     "Facility" means a building or buildings in which the Covered Games authorized by this Compact are conducted.

L.     "Fantasy Sports Contest" means a fantasy or simulation sports game or contest offered by a contest operator or a noncommercial contest operator in which a contest participant manages a fantasy or simulation sports team composed of athletes from a professional sports organization and that meets each of the following requirements:

> 1.     All prizes and awards offered to winning contest participants are established and made known to the contest participants in advance of the game or contest.
>
> 2.     All winning outcomes reflect the relative knowledge and skill of the contest participants and are determined predominantly by accumulated statistical results of the performance of individuals, including athletes in the case of sporting events.
>
> 3.     No winning outcome is based on the score, point spread, or any performance or performances of any single actual team or combination of such teams, solely on any single performance of an individual athlete or player in any single actual event, on a pari-mutuel event, as the term "pari-mutuel" is defined in s. 550.002, Florida Statutes, as of January 1, 2021, on a game of poker or other card game, or on the performances of participants in collegiate, high school or youth sporting events.

Seminole Compact
Page 8

4.      No casino graphics, themes, or titles, including, but not limited to, depictions of slot machine-style symbols, cards, dice, craps, roulette, or lotto, are displayed or depicted.

5.      For purposes of this definition:

(a)      "Contest operator" means a person or entity that offers fantasy or simulation sports game(s) or contest(s) for a cash prize.

(b)      "Contest participant" means a person who pays an entry fee for the ability to participate in a fantasy or sports simulation game or contest offered by a contest operator.

(c)      "Noncommercial contest operator" means a natural person who organizes and conducts a fantasy or simulation sports game in which contest participants are charged entry fees for the right to participate; entry fees are collected, maintained, and distributed by the same natural person; the total entry fees collected, maintained, and distributed by such natural person do not exceed one thousand five hundred dollars ($1,500) per season or a total of ten thousand dollars ($10,000) per calendar year; and all entry fees are returned to the contest participants in the form of prizes.

M.      "Guaranteed Minimum Compact Term Payment" means a minimum total payment for the first five (5) years of this Compact of Two Billion Five Hundred Million Dollars ($2,500,000,000) which shall include all Revenue Share Payments for the first five (5) years of this Compact.

Seminole Compact
Page 9

     N.    "Historic Racing Machine" means an individual historic race terminal linked to a central server as part of a network-based video game, where the terminals allow pari-mutuel wagering by players on the results of previously conducted horse or greyhound races, but only if the game is certified in advance by an Independent Testing Laboratory approved by the Division of Pari-Mutuel Wagering, or a successor agency, as complying with all of the following requirements:

     1.    All data on previously conducted horse or greyhound races must be stored in a secure format on the central server, which is located at the pari-mutuel facility.

     2.    Only horse or greyhound races that were recorded at licensed pari-mutuel facilities in the United States after January 1, 2000, may be used.

     3.    One (1) or more of the following three (3) bet types must be offered on all Historic Racing Machines:  Win-Place-Show, Quinella, or Tri-Fecta.

     4.    All Historic Racing Machines must offer one (1) or more of the following racing types:  Thoroughbreds, Harness, or Greyhounds.

     5.    Progressive prizes in excess of two thousand five hundred dollars ($2,500) are prohibited.

     6.    Other than progressive prizes not to exceed two thousand five hundred dollars ($2,500), no prize exceeding one thousand dollars ($1,000) may be awarded.

     7.    After each wager is placed, the Historic Racing Machine must display a video of at least the final eight (8) seconds of the horse or

Seminole Compact
Page 10

greyhound race before any prize is awarded or indicated on the Historic Racing Machine.

8.   The display of the video of the horse or greyhound race must occupy at least seventy percent (70%) of the Historic Racing Machine's video screen and no Historic Racing Machine may contain or be linked to more than one video display.

9.   No casino game graphics, themes or titles, including but not limited to depictions of slot machine-style symbols, cards, dice, craps, roulette, lotto, or bingo may be used.

10.   No video or mechanical reel displays are permitted.

11.   No Historic Racing Machine may contain more than one player position for placing wagers.

12.   No coins, currency or tokens may be dispensed from a Historic Racing Machine.

13.   Prizes must be awarded based solely on the results of a previously conducted horse or greyhound race. No additional element of chance may be used. However, a random number generator must be used to select the race from the central server to be displayed to the player(s) and to select numbers or other designations of race entrants that will be used in the various bet types for any "Quick Pick" bets. To prevent an astute player from recognizing the race based on the entrants and thus knowing the results before placing a wager, the entrants of the race may not be identified until after all wagers for that race have been placed.

O.    "Independent Testing Laboratory" means an independent laboratory: (1) with demonstrated competence testing gaming machines and equipment; (2) that is licensed by at least ten (10) other states; and (3) that has not had its license suspended or revoked by any other state within the immediately preceding ten (10) years.

P.    "Indian Gaming Regulatory Act" or "IGRA" means the Indian Gaming Regulatory Act, Pub. L. 100-497, Oct. 17, 1988, 102 Stat. 2467, codified at 25 U.S.C. ss. 2701 *et seq.* and 18 U.S.C. ss. 1166 to 1168.

Q.    "Indian Lands" means the lands defined in 25 U.S.C. s. 2703(4).

R.    "Lottery Vending Machine" means any of the following three (3) types of machines:

1.    A machine to dispense pre-printed paper instant lottery tickets, but that does not read or reveal the results of the ticket, or allow a player to redeem any ticket. The machine, any machine or device linked to the machine, or any online application that facilitates the purchase of a paper lottery ticket, may not include or make use of video reels or mechanical reels or other video depictions of slot machine or casino game themes or titles for game play. This does not preclude the use of casino game themes or titles or sports themes or titles on such tickets or signage or advertising displays on the machines;

2.    A machine to dispense pre-determined electronic instant lottery tickets that displays an image of the ticket on a video screen on the machine and the player must touch the image of the ticket on the video screen to reveal the outcome of the ticket, provided the machine does not

permit a player to redeem winnings, does not make use of video reels or

mechanical reels or simulate the play of any casino game, and the lottery

retailer is paid the same amount as would be paid for the sale of paper

instant lottery tickets; or

3.      A machine to dispense a paper lottery ticket with numbers selected

by the player or randomly by the machine.  The machine does not reveal

the winning numbers and the winning numbers are selected at a

subsequent time and different location through a drawing by the Florida

Lottery.  The machine, any machine or device linked to the machine, or

any online application that facilitates the purchase of a paper lottery ticket,

may not include or make use of video reels or mechanical reels or other

video depictions of slot machine or casino game themes or titles for game

play.  The machine may not be used to redeem a winning ticket.  This does

not preclude the use of casino game themes or titles for signage or

advertising displays on the machine.

S.      "Monthly Payment" means the monthly Revenue Share Payment which

the Tribe remits to the State on the fifteenth (15th) day of the month following each

month of the Revenue Sharing Cycle.

T.      "Net Win" means the total receipts from the play of all Covered Games

less all prize payouts and free play or promotional credits issued by the Tribe.

U.      "Other Casino-Style Gaming" means the same as "casino gambling" in

Article X, s. 30 of the Florida Constitution, but not excluding any games authorized by

Seminole Compact
Page 13

Article X, s. 15 of the Florida Constitution if such games involve any slot-like or casino-style game.

    V.    "Pari-Mutuel Wagering Activities" means those activities presently authorized by Chapter 550, Florida Statutes, which do not include any casino-style game or game or device that includes video reels or mechanical reels or other slot machine or casino game themes or titles.

    W.    "Patron" means any person who is on the premises of a Facility, or who is entering the Tribe's Indian lands for the purpose of playing Covered Games authorized by this Compact, and includes any person participating in Sports Betting.

    X.    "Qualified Pari-mutuel Permitholder(s)" means a person or entity that:

        1.    Held, prior to January 1, 2021, a pari-mutuel wagering permit issued, pursuant to chapter 550, Florida Statutes; and

        2.    Held, prior to January 1, 2021, a pari-mutuel operating license issued pursuant to s. 550.01215, Florida Statutes; and

        3.    Holds a slot machine license issued pursuant to chapter 551, Florida Statutes, or a cardroom license issued pursuant to s. 849.086, Florida Statutes.

    Y.    "Revenue Share Payment" means the periodic payment by the Tribe to the State provided for in Part XI of this Compact.

    Z.    "Revenue Sharing Cycle" means the annual (12-month) period of the Tribe's operation of Covered Games at its Facilities beginning on the first (1st) day of the first month after the Effective Date.

AR032

Seminole Compact
Page 14

AA.    "Rules and Regulations" means the rules and regulations promulgated by the Commission for implementation of this Compact.

BB.    "Slot Machines" means any mechanical or electrical contrivance, terminal that may or may not be capable of downloading slot games from a central server system, machine, or other device that, upon insertion of a coin, bill, ticket, token, or similar object or upon payment of any consideration whatsoever, including the use of any electronic payment system, is available to play or operate, the play or operation of which, whether by reason of skill or application of the element of chance or both, may deliver or entitle the person or persons playing or operating the contrivance, terminal, machine, or other device to receive cash, billets, tickets, tokens, or electronic credits to be exchanged for cash or to receive merchandise or anything of value whatsoever, whether the payoff is made automatically from the machine or manually.  The term includes slot machines that employ video and/or mechanical displays of roulette, wheels or other table game themes. The term includes associated equipment necessary to conduct the operation of the contrivance, terminal, machine, or other device.  Slot machines may use spinning reels, video displays, or both.

CC.    "Sports Betting" means wagering on any past or future professional sport or athletic event, competition or contest, any Olympic or international sports competition event, any collegiate sport or athletic event (but not including proposition bets on such collegiate sport or event), or any motor vehicle race, or any portion of any of the foregoing, including but not limited to the individual performance statistics of an athlete or other individual participant in any event or combination of events, or any other "in-play" wagering with respect to any such sporting event, competition or contest, except

AR033

Seminole Compact
Page  15

"Sports Betting" does not include Fantasy Sports Contests, pari-mutuel wagering, or betting on any form of poker or other card game; provided that and only when:

1.      All such wagering is done exclusively by and through one or more sports books conducted and operated by the Tribe or its approved management contractor, including the servers and devices required to conduct the same, at one or more of the Tribal Facilities identified in Part IV, Sections B and D.

2.      All such wagering shall be deemed at all times to be exclusively conducted by the Tribe at its Facilities where the sports book(s), including servers and devices to conduct the same, are located, including any such wagering undertaken by a Patron physically located in the State but not on Indian Lands using an electronic device connected via the internet, web application or otherwise, including, without limitation, any Patron connected via the internet, web application or otherwise of any Qualified Pari-mutuel Permitholder(s) and regardless of the location in Florida at which a Patron uses the same.

3.      At all times that the Tribe offers or is offering such wagering, the Tribe has a written contract with any and all willing Qualified Pari-mutuel Permitholder(s) which:

(a)      Expressly authorizes and permits a Qualified Pari-mutuel Permitholder(s) to perform marketing or similar services for the Tribe's sports book(s), related to, for and including such wagering undertaken through the use of electronic devices that will utilize

AR034

Seminole Compact
Page 16

the digital sports book(s) provided by the Tribe, and that use a

brand of the Qualified Pari-mutuel Permitholder(s);

(b)      The Tribe, as the exclusive operator of sports book(s) on

Tribal lands, must consistently provide to Qualified Pari-mutuel

Permitholder(s) in standardized format(s) the digital interfaces

necessary for Qualified Pari-mutuel Permitholder(s) to market

digitally, including through the Qualified Pari-mutuel

Permitholder's development or procurement of customizable web

or mobile assets for marketing services, the sports book(s) operated

on Tribal lands. The interfaces published by the Tribe must

facilitate the dynamic and accurate publication of data to Qualified

Pari-mutuel Permitholder(s) such that any changes within the

source(s) of truth contained within the Tribe's sports book(s) are

distributed in real-time to all Qualified-Pari-mutuel

Permitholder(s);

(c)      Requires the Tribe to compensate the Qualified Pari-mutuel

Permitholder(s) for such services by payment of an amount not less

than sixty (60) percent of the difference between: (i) the Net Win

earned by the Tribe on all such wagering by Patrons who access

the Tribe's wagering platform via software that uses a brand of the

Qualified Pari-mutuel Permitholder; and (ii) a reasonable and

proportionate share of all expenses incurred by the Tribe in

operating and conducting such wagering through the marketing

services of a Qualified Pari-Mutuel Permitholder, which shall be specified in advance in the written contract between the Tribe and the Qualified Pari-mutuel Permitholder and reported to the SCA after being incurred.  The Tribe shall remain the exclusive operator of the sports book(s), and the Tribe's total payment for all marketing or similar services by Qualified Pari-Mutuel Permitholders shall not exceed forty (40) percent of the Tribe's total Net Win on Sports Betting, in accordance with IGRA;

(d)      Expressly states that all such wagering is conducted exclusively at one or more of the Tribal Facilities identified in Part IV, Sections B and D, even if Qualified Pari-mutuel Permitholders market the Tribe's sports book by providing dedicated areas within their facilities wherein Patrons may access or use electronic devices to place wagers via the Internet, web applications, or otherwise to the Tribe's sports book;

(e)      Allows the Tribe to suspend the participation of the Qualified Pari-mutuel Permitholder from providing marketing services under the written contract upon a violation by the Qualified Pari-mutuel Permitholder of:

(i)      The written contract; or

(ii)      The Tribe's exclusivity under this Compact.

Provided the Tribe provides written notice to the Qualified Pari-mutuel Permitholder and the Qualified Pari-mutuel Permitholder

Seminole Compact
Page 18

fails to completely halt such violation(s) within thirty (30) days after such notice;

(f)     Prohibits the Tribe from using player data obtained from a Qualified Pari-mutuel Permitholder to market Covered Games offered by the Tribe; and

(g)     Provides for a duration of the contract that must be no less than five (5) years, unless terminated by mutual agreement or by material breach.

4.     Within three (3) months of the Effective Date of this Compact, the Tribe shall negotiate in good faith with any and all willing Qualified Pari-mutuel Permitholders to enter into written contracts as provided in this Section.  If for any reason the Tribe does not have valid written contracts with at least three (3) or more Qualified Pari-mutuel Permitholders upon or following the commencement of the Tribe's Sports Betting operation, the Payments due to the State pursuant to Part XI, Section C.1(j) of this Compact based on the Net Win received by the Tribe from the operation and play of Sports Betting shall increase by two (2) percent until the Tribe has valid written contracts with at least three (3) Qualified Pari-mutuel Permitholders to perform marketing or similar services for the Tribe's Sports Betting.  If the Tribe has written contracts with three (3) or more Qualified Pari-mutuel Permitholders, the Tribe shall make good faith offers to other Qualified Pari-mutuel Permitholders, upon request, with terms similar to those of its executed contracts.

Seminole Compact
Page 19

5.      With respect to wagers made with a mobile or other electronic

device, the Tribe shall implement:

      (a)      A registration process to validate player identity, including

      their age;

      (b)      An AML (anti-money laundering) process to verify the

      source of funds, track transactions, prevent anonymous deposits

      and submit official reports to FINCEN as required; and

      (c)      Geo-fencing to prevent wagers by players not physically

      located in the State.

6.      With respect to all forms of Sports Betting, the Tribe shall comply

with the rules and regulations adopted by the Commission pursuant to Part

V, Section A, including any requirements for video depictions of wagering

outcomes.

7.      Any data source and the corresponding data to determine the

results of all sports bets must be (i) complete, accurate, reliable, timely

and available and (ii) appropriate to settle the types of events and wagers

for which it is used.

8.      The SCA may utilize the dispute resolution provisions set forth in

Part XIII if it believes the Tribe has failed to comply with the

requirements for Sports Betting, including the requirements in Section

CC.3.

DD.      "State" means the State of Florida.

Seminole Compact
Page 20

EE.     "State Compliance Agency" or "SCA" means the state agency designated

by the Florida Legislature that has the authority to carry out the State's oversight

responsibilities under this Compact.

FF.     "Table Game" means banking or banked card games, including baccarat,

chemin de fer, blackjack (21), and card games banked by the house, by a bank established

by the house, or by a player; craps, including dice games such as sic-bo and any similar

variations thereof; and roulette, including big six and any similar variations thereof.

GG.     "Tribe" means the Seminole Tribe of Florida or any affiliate thereof

conducting activities pursuant to this Compact under the authority of the Seminole Tribe

of Florida.

Part IV.  AUTHORIZATION AND LOCATION OF COVERED GAMES

A.      The Tribe and State agree that the Tribe is authorized to operate Covered

Games on its Indian lands, as defined in the Indian Gaming Regulatory Act, in

accordance with the provisions of this Compact.  Subject to limitations set forth herein,

wagers on Sports Betting and Fantasy Sports Contests made by players physically located

within the State using a mobile or other electronic device shall be deemed to take place

exclusively where received at the location of the servers or other devices used to conduct

such wagering activity at a Facility on Indian Lands.  Nothing in this Compact shall limit

the Tribe's right to operate any game that is Class II under the Indian Gaming Regulatory

Act.

B.      Except as provided in Part IV, Section D below, the Tribe is authorized to

conduct Covered Games under this Compact at only the following seven (7) existing

Seminole Compact
Page 21

Facilities, which may be relocated, expanded or replaced as provided for in Part IV,

Section C below, on Indian Lands:

> Seminole Indian Casino - Brighton
> Okeechobee, FL
>
> Seminole Indian Casino - Coconut Creek
> Coconut Creek, FL
>
> Seminole Indian Casino - Hollywood
> Hollywood, FL
>
> Seminole Indian Casino - Immokalee
> Immokalee, FL
>
> Seminole Indian Casino - Big Cypress
> Clewiston, FL
>
> Seminole Hard Rock Hotel & Casino - Hollywood
> Hollywood, FL
>
> Seminole Hard Rock Hotel & Casino - Tampa
> Tampa, FL

C.     Any of the Facilities existing on Indian Lands identified in Part IV,

Section B may be relocated, expanded or replaced by another Facility on the same Indian

Land with advance notice to the State of sixty (60) calendar days.  However, the Tribe

agrees that it will not build Las Vegas-style casino resorts on its Brighton or Big Cypress

Reservations.  Any dispute over whether a proposed Facility violates this provision shall

be resolved in accordance with the dispute resolution process set forth in Part XIII.

D.     The Tribe may add three (3) additional Facilities on the parcel which is

part of the Tribe's Hollywood Reservation and which is east of the present location of the

Florida Turnpike.

Seminole Compact
Page 22

Part V.  RULES AND REGULATIONS; MINIMUM REQUIREMENTS FOR
OPERATIONS

A.1.   At all times during the term of this Compact, the Tribe shall be responsible

for all duties that are assigned to it and the Commission under this Compact.  The

Tribe shall promulgate any rules and regulations necessary to implement this

Compact, which at a minimum shall expressly include or incorporate by reference

all provisions of Part V, VI, VII and VIII of this Compact.  Nothing in this

Compact shall be construed to affect the Tribe's right to amend its rules and

regulations, provided that any such amendment shall comply with this Compact.

The SCA may propose additional rules and regulations consistent with and related

to the implementation of this Compact to the Commission at any time, and the

Commission shall give good faith consideration to such proposals and shall notify

the SCA of its response or action with respect thereto.

2.     The Commission, after consultation with the SCA, shall promulgate

specific rules and regulations for Sports Betting that shall:

(a)     Limit participation in Sports Betting only to Patrons who are

natural persons who are twenty-one (21) years of age or older;

(b)     Establish standards, that apply equally to the Tribe and to

Qualified Pari-mutuel Permitholders, for promotional credits, incentives,

bonuses, complimentaries, or similar benefits designed to induce Patrons

to participate in Sports Betting;

(c)     Specify the Tribal Facilities at which the servers or other

equipment used for Sports Betting will be located;

(d)     Establish how the odds at which wagers may be placed on sports events will be determined and displayed;

(e)     Require the development and maintenance of a list of individuals ("Restricted Patrons") to be restricted and prohibited from engaging in Sports Betting as a result of such individual being a person who holds a position of authority or influence over the participants in a sports event, or any person with access to certain types of exclusive information on any sports event, including, but not limited to, athletes, coaches, referees, managers, handlers, trainers, agents, a sports governing body and its employees and owners, and a sports team and its employees and owners;

(f)     Establish procedures to verify the identity of persons participating in Sports Betting and prevent the following persons from participating in Sports Betting, including:

(i)     Any Covered Game Employee of the Tribe's Sports Betting operation;

(ii)    Any person whose identity is known to the Tribe and whose name appears on any exclusion or self-exclusion list;

(iii)   Any person included on the list of Restricted Patrons;

(iv)    Any person who has access to nonpublic confidential information held by the Tribe or a Qualified Pari-mutuel Permitholder; and

(v)     Any person who is an agent or proxy for any other person and is wagering for such other person; and

Seminole Compact
Page  24

(g)     Specify the records which must be maintained and the procedures

and processes for maintaining such records;

(h)      Establish and require display of the rules for Sports Betting,

including permissible minimum and maximum wagers that may be placed

on sports events;

(i)     Establish procedures to monitor the locations at which online

Sports Betting is conducted;

(j)     Require that the Tribe and Qualified Pari-mutuel Permitholders

report to the Commission and the SCA:

(i)      Any abnormal betting activity or patterns that may indicate

a concern about the integrity of a sports event or events;

(ii)     Any other conduct with the potential to corrupt a betting

outcome of a sports event for purposes of financial gain,

including but not limited to match fixing; and

(iii)    Suspicious or illegal wagering activities, including the

use of funds derived from illegal activity, wagers to conceal or

launder funds derived from illegal activity, use of agents to

place wagers, or use of false identification; and

(k)     Comply with all requirements imposed by the National Indian

Gaming Commission (NIGC).

3.     The SCA may request that the Tribe restrict specific types of Sports

Betting which carry an unacceptably high risk of manipulation or corruption.

4.      The SCA may propose additional rules and regulations consistent with and related to the implementation of this Compact to the Commission at any time, and the Commission shall give good faith consideration to such suggestions and shall notify the SCA of its response or action with respect thereto.

B.      All Facilities shall comply with, and all Covered Games approved under this Compact shall be operated in accordance with the requirements set forth in this Compact, including but not limited to, those set forth in Sections C and D of this Part and the Tribe's Internal Control Policies and Procedures.  In addition, all Facilities and all Covered Games shall be operated in strict compliance with tribal internal control standards that provide a level of control that equals or exceeds those set forth in the NIGC's Guidance for Class III Minimum Internal Control Standards, maintained at www.nigc.gov.  The Tribe may amend or supplement its internal control standards from time to time, provided that such changes continue to provide a level of control that equals or exceeds those set forth in the NIGC's Guidance for Class III Minimum Internal Control Standards, maintained at www.nigc.gov.

C.      The Tribe and the Commission shall retain all Documents in compliance with the requirements set forth in the Tribe's Record Retention Policies and Procedures.

D.      Compulsive Gambling.

The Tribe will continue and maintain its program to combat problem gambling and curtail compulsive gambling and work with the Florida Council on Compulsive Gambling or other organizations dedicated to assisting problem gamblers, including any provider from which the State procures services pursuant to s. 551.118, Florida Statutes. The Tribe will continue to maintain the following safeguards against problem gambling.

1.      The Tribe will provide a comprehensive training and education program designed in cooperation with the Florida Council on Compulsive Gambling or other organization dedicated to assisting problem gamblers to every new Covered Gaming Employee who interacts with Patrons.

2.      The Tribe will make printed materials and online materials available to Patrons, which include contact information for the Florida Council on Compulsive Gambling 24-Hour Helpline or other hotline dedicated to assisting problem gamblers, and will work with the Florida Council on Compulsive Gambling or other organization dedicated to assisting problem gamblers to provide contact information for the Florida Council on Compulsive Gambling or other organization dedicated to assisting problem gamblers, and to provide such information on the Facilities' internet website.  The Tribe will continue to display all literature from the Florida Council on Compulsive Gambling or other organization dedicated to assisting problem gamblers within the Facilities and provide hyperlinks to online information available from the Florida Council on Compulsive Gambling and other similar organizations.

3.      The Tribe shall establish a list of the Patrons voluntarily excluded from the Tribe's Facilities and from participating in the Tribe's online Sports Betting, pursuant to subsection 5.

4.      The Tribe shall employ its best efforts to exclude Patrons on such list from entry into its Facilities and from participating in the Tribe's online Sports Betting; provided that nothing in this Compact shall create for Patrons who are excluded but gain access to the Facilities or participate in the Tribe's online Sports Betting,

or any other person, a cause of action or claim against the State, the Tribe or the Commission or any other person, entity, or agency for failing to enforce such exclusion.

5.      Patrons who believe they may be playing Covered Games on a compulsive basis may request that their names be placed on the list of Patrons voluntarily excluded from the Tribe's Facilities and from participating in the Tribe's online Sports Betting.

6.      All Covered Game Employees shall receive training on identifying players who have a problem with compulsive gambling and shall be instructed to ask them to leave.  Signs bearing a toll-free help-line number and educational and informational materials shall be made available at conspicuous locations and automated teller machines in each Facility, which aim at the prevention of problem gaming and which specify where Patrons may receive counseling or assistance for gambling problems.  All Covered Game Employees shall also be screened by the Tribe for compulsive gambling habits.  Nothing in this Section shall create for Patrons, or any other person, a cause of action or claim against the State, the Tribe or the Commission or any other person, entity, or agency for failing to identify a Patron or person who is a compulsive gambler and/or ask that person to leave.

7.      The Tribe shall follow the rules for exclusion of Patrons set forth in the Seminole Tribal Gaming Code.

8.      The Tribe shall make diligent efforts to prevent underage individuals from loitering in the area of each Facility where the Covered Games take place or

Seminole Compact
Page 28

accessing for play or playing any application or website employed for online

Sports Betting.

9.      The Tribe shall assure that advertising and marketing of the Covered

Games at the Facilities and of all web applications and websites employed for

online Sports Betting contain a responsible gambling message and a toll-free

help-line number for problem gamblers, where practical, and that such advertising

and marketing make no false or misleading claims.

E.      The State may secure an annual independent audit of the conduct of

Covered Games subject to this Compact, as set forth in Part VIII.

F.      Summaries of the rules for playing Covered Games and promotional

contests shall be visibly displayed in the Facilities and shall be visibly displayed and

available on all web applications and websites employed for online Sports Betting.

Complete sets of rules shall be available in the Facilities upon request and shall be visibly

displayed and available on all web applications and websites employed for online Sports

Betting.  Copies of all such rules shall be provided to the SCA annually.

G.      The Tribe shall provide the Commission and SCA with a chart of the

supervisory lines of authority with respect to those directly responsible for the conduct of

Covered Games, and shall promptly notify those agencies of any material changes

thereto.

H.      The Tribe engages in and shall continue to maintain proactive approaches

to prevent improper alcohol sales, drunk driving, underage drinking, and underage

gambling.  These approaches involve intensive staff training, screening and certification,

Patron education, and the use of security personnel and surveillance equipment in order

to enhance Patrons' enjoyment of the Facilities and provide for Patron safety. Staff training includes specialized employee training in nonviolent crisis intervention, driver's license verification and the detection of intoxication. Patron education is carried out through notices transmitted on valet parking stubs, posted signs in the Facilities, and in brochures. Roving and fixed security officers, along with surveillance cameras, assist in the detection of intoxicated Patrons, investigate problems, and engage with Patrons to de-escalate volatile situations. To help prevent alcohol-related crashes, the Tribe will continue to operate a "Safe Ride Home Program," free of charge to the Patron. The Tribe shall maintain these programs and policies in its Alcohol Beverage Control Act for the duration of the Compact but may replace such programs and policies with either stricter or more extensive programs and policies. The Tribe shall provide the State with written notice of any changes to the Tribe's Alcohol Beverage Control Act, which notice shall include a copy of such changes and shall be sent on or before the effective date of the change. Nothing in this Section shall create for Patrons, or any other person, a cause of action or claim against the State, the Tribe or the Commission or any other person, entity, or agency for failing to fulfill the requirements of this Section.

I.       No person under the age of twenty-one (21) shall be allowed to play Covered Games, unless otherwise permitted by State law.

J.       The Tribe may establish and operate Facilities that operate Covered Games only on its Indian Lands as defined by the Indian Gaming Regulatory Act and as specified in Part IV.

AR048

Seminole Compact
Page  30

 K. The Commission shall keep a record of, and shall report at least quarterly to the SCA, the number of Covered Games in each Facility, by the name or type of each and any identifying number.

 L. The Tribe and the Commission shall make available a copy of the following documents to any member of the public upon request within ten (10) business days: the NIGC's Guidance for Class III Minimum Internal Control Standards, maintained at www.nigc.gov; the Seminole Tribal Gaming Code; this Compact; the rules of each Covered Game operated by the Tribe; and the administrative procedures for addressing Patron tort claims under Part VI.  Such materials shall be available on all web applications and websites employed for online Sports Betting, including those associated with the marketing services provided to the Tribe by Qualified Pari-mutuel Permitholders.

Part VI.  PATRON DISPUTES; WORKERS COMPENSATION; TORT CLAIMS;
PRIZE CLAIMS; LIMITED CONSENT TO SUIT

 A. All Patron disputes involving gaming will be resolved in accordance with the procedures established in the Seminole Tribal Gaming Code.  If the Patron is not satisfied after exhaustion of the procedures established in the Seminole Tribal Gaming Code, the Patron may submit an appeal of the dispute to the SCA.  The SCA shall work with the Tribe to establish a process for the SCA to review appeals of such disputes, including submission of evidence and arguments by the Patron and the Tribe to the SCA. The decision of the SCA on such disputes shall be binding on the Tribe and Patron, provided the Tribe shall not be required to pay a Patron due to a game malfunction and

no payment shall exceed the actual amount of the prize available from the game that is the subject of the dispute.

B.     Tort claims by employees of the Tribe's Facilities will be handled pursuant to the provisions of the Tribe's Workers' Compensation Ordinance, which shall provide workers the same or better protections as set forth in the State's workers' compensation laws.

C.     Disputes by employees of the Tribe's Facilities will be handled pursuant to the provisions of the Tribe's policy for gaming employees, as set forth in the Tribe's Employee Fair Treatment and Dispute Resolution Policy.

D.     Tort remedies for Patrons.

1.     A Patron who claims to have been injured after the Effective Date while physically at one of the Tribe's Facilities listed in Part IV is required to provide written notice in the form of the Notice of Gaming Patron Tort Form to the Tribe's Risk Management Department, in a reasonable and timely manner, but in no event later than three (3) years after the date of the incident giving rise to the claimed injury, or the claim shall be forever barred.  A Patron may obtain the Notice of Gaming Patron Tort Form from the Facility's website or upon written request made to the Tribe's Risk Management Department.

2.     The Tribe, or its Insurer, shall have thirty (30) days from the date the Tribe's Risk Management Department receives the Notice of Gaming Patron Tort Form to respond to a claim made by a Patron.  If the Tribe, or its Insurer, fails to respond within thirty (30) days, the Patron may file suit against the Tribe.  When

Seminole Compact
Page 32

the Tribe responds to an incident alleged to have caused a Patron's injury or

illness, the Tribe shall provide a Notice of Gaming Patron Tort Form to the

Patron.  The Notice of Gaming Patron Tort Form must include the address for the

Tribe's Risk Management Department and provide notice of the Tribe's

administrative procedures for addressing Patron tort claims, including notice of

the relevant deadlines that may bar such claims if the Tribe's administrative

procedures are not followed.  It is the Patron's responsibility to complete the

Notice of Gaming Patron Tort Form and forward the form to the Tribe's Risk

Management Department within a reasonable period of time, and in a reasonable

and timely manner.  Nothing herein shall interfere with any claim a Patron might

have arising under the Federal Tort Claim Act.

3.      Upon receiving the Notice of Gaming Patron Tort Form, the Tribe's Risk

Management Department shall forward the notification to the Tribe's insurance

carrier.  The Tribe will use its best efforts to assure that the insurance carrier

contacts the Patron within a reasonable period of time following receipt of the

claim.

4.      The insurance carrier will handle the claim to conclusion.  If the Patron

and the Tribe and the insurance carrier are not able to resolve the claim in good

faith within one (1) year after the Notice of Gaming Patron Tort Form was

submitted by or on behalf of the Patron and received by the Tribe's Risk

Management Department, the Patron may bring a tort claim against the Tribe in

any court of competent jurisdiction in the county in which the incident alleged to

have caused injury occurred, as provided in this Compact, and subject to a four

(4) year statute of limitations, which shall begin to run from the date of the

incident of the alleged claimed injury.  A Patron's notice of injury to the Tribe

pursuant to Section D.1 of this Part and the fulfillment of the good faith attempt at

resolution pursuant to Sections D.2 and 4 of this Part are conditions precedent to

filing suit.

5.      For tort claims of Patrons made pursuant to Section D of this Part, the

Tribe agrees to waive its tribal sovereign immunity to the same extent as the State

of Florida waives its sovereign immunity, as specified in ss. 768.28(1) and (5),

Florida Statutes, as such provision may be amended from time-to-time by the

Florida Legislature.  In no event shall the Tribe be deemed to have waived its

tribal immunity from suit beyond the limits set forth in s. 768.28(5), Florida

Statutes.  Section 768.28(8), Florida Statutes, as such provision may be amended

from time to time by the Florida Legislature, applies to all tort claims of Patrons

made pursuant to Section D of this Part.  These limitations are intended to include

liability for compensatory damages, costs, pre-judgment interest, and attorney

fees if otherwise allowable under Florida law arising out of any claim brought or

asserted against the Tribe, its subordinate governmental and economic units, any

Tribal officials, employees, servants, or agents in their official capacities and any

entity which is owned, directly or indirectly by the Tribe.  All Patron tort claims

brought pursuant to this provision shall be brought solely against the Tribe, as the

sole party in interest.

Seminole Compact
Page 34

6.      Notices explaining the procedures and time limitations with respect to making a tort claim shall be prominently displayed in the Facilities, posted on the Facility's website, and provided to any Patron for whom the Tribe has notice of the injury or property damage giving rise to the tort claim.  Such notices shall explain the method and places for making a tort claim, including where the Patron must submit the Notice of Gaming Patron Tort Form, that the process is the exclusive method for asserting a tort claim arising under this section against the Tribe, that the Tribe and its insurance carrier have one (1) year from the date the Patron gives notice of the claim to resolve the matter and after that time the Patron may file suit in a court of competent jurisdiction, that the exhaustion of the process is a pre-requisite to filing a claim in state court, and that claims which fail to follow this process shall be forever barred.

7.      The Tribe shall maintain an insurance policy which shall:

(a)     Prohibit the insurer or the Tribe from invoking tribal sovereign immunity for claims up to the limits to which the State of Florida has waived sovereign immunity as set forth in s. 768.28(5), Florida Statutes, or its successor statute.

(b)     Include covered claims made by a Patron or invitee for personal injury or property damage.

(c)     Permit the insurer or the Tribe to assert any statutory or common law defense other than sovereign immunity.

Seminole Compact
Page 35

(d)     Provide that any award or judgment rendered in favor of a Patron or invitee shall be satisfied solely from insurance proceeds.

8.     The Tribal Council of the Seminole Tribe of Florida may, in its discretion, consider claims for compensation in excess of the limits of the Tribe's waiver of its sovereign immunity.

Part VII. ENFORCEMENT OF COMPACT PROVISIONS

A.     The Tribe, the Commission and the SCA, to the extent authorized by the Compact, shall be responsible for regulating activities pursuant to this Compact.  As part of its responsibilities, the Tribe has adopted or issued standards designed to ensure that the Facilities are constructed, operated and maintained in a manner that adequately protects the environment and public health and safety.  Additionally, the Tribe and the Commission shall ensure that:

1.     Operation of the conduct of Covered Games is in strict compliance with:

(a)     The Seminole Tribal Gaming Code;

(b)     All rules, regulations, procedures, specifications, and standards lawfully adopted by the National Indian Gaming Commission and the Commission;

(c)     The provisions of the federal Wire Act, 18 U.S.C. s. 1084, as such provision may be amended from time-to-time, and all other applicable federal laws with respect to the conduct of Sports Betting; and

(d)      The provisions of this Compact, including, but not limited to, the

Tribe's standards and the Tribe's Rules and Regulations; and

2.      Reasonable measures are taken to:

(a)      Assure the physical safety of Patrons, employees, and any other

person while physically present in the Tribe's Facilities listed in Part IV;

(b)      Prevent illegal activity at the Tribe's Facilities or with regard to the

operation of Covered Games, including, but not limited to, the

maintenance of employee procedures and a surveillance system;

(c)      Prevent illegal activity associated with or involving all web

applications and websites employed for Sports Betting;

(d)      Ensure prompt notification is given to appropriate law enforcement

authorities of persons who may be involved in illegal acts in accordance

with applicable law;

(e)      Ensure that the construction and maintenance of the Tribe's

Facilities comply with the standards of the Florida Building Code, the

provisions of which the Tribe has adopted as the Seminole Tribal Building

Code; and

(f)      Ensure adequate emergency access plans have been prepared to

ensure the health and safety of all Covered Game Patrons.

B.      All licenses for members and employees of the Commission shall be

issued according to the same standards and terms applicable to Facility employees.  The

Commission's officers shall be independent of the Tribal gaming operations, and shall be

supervised by and accountable only to the Commission.  A Commission officer shall be

Seminole Compact
Page 37

available to the Facility during all hours of operation upon reasonable notice, and shall

have immediate access to any and all areas of the Facility for the purpose of ensuring

compliance with the provisions of this Compact.  The Commission shall investigate any

suspected or reported violation of this Part and shall officially enter into its files timely

written reports of investigations and any action taken thereon, and shall forward copies of

such investigative reports to the SCA within thirty (30) calendar days of such filing.  The

scope of such reporting shall be determined by the existing memorandum of

understanding between the Commission and the SCA which shall be amended as soon as

practicable after the Effective Date of this Compact to incorporate all Covered Games,

and which may be amended by the Commission and the SCA from time to time.  Any

such violations shall be reported immediately to the Commission by Facility management

or by a Covered Game Employee, and the Commission shall notify the SCA as provided

in the amended memorandum of understanding between the Commission and the SCA.

In addition, the Commission shall promptly report to the SCA any such violations which

it independently discovers.

     C.    In order to develop and foster a positive and effective relationship in the

enforcement of the provisions of this Compact, representatives of the Commission and

the SCA shall meet, not less than on an annual basis, to review past practices and

examine methods to improve the regulatory scheme created by this Compact.  The

meetings shall take place at a location mutually agreed to by the Commission and the

SCA. The Commission and the SCA, prior to or during such meetings, shall disclose to

each other any concerns, suspected activities, or pending matters reasonably believed to

possibly constitute violations of this Compact or, if related to the terms of this Compact,

Seminole Compact
Page 38

of chapters 546, 550, 551, Florida Statutes, or chapter 849, Florida Statutes, by any

person, organization or entity, if such disclosure will not compromise the interest sought

to be protected. The provisions of this Subsection do not require the SCA to reveal any

active criminal investigation or criminal intelligence information, as those terms are

defined in s. 119.011, Florida Statutes, as such provision may be amended from time-to-

time by the Florida Legislature.


Part VIII. STATE MONITORING OF COMPACT

   A.  It is the express intent of the Tribe and the State for the Tribe to regulate

its own gaming activities, but the parties recognize that the State is entitled to conduct

random inspections as provided for in this Part to assure that the Tribe is operating in

accordance with the terms of the Compact. The State may secure, and the Tribe will be

required to provide all necessary cooperation for, an annual independent audit of the

conduct of Covered Games subject to this Compact. The audit shall:

   1.  Examine the Covered Games operated by the Tribe to assure compliance

  with the Tribe's Internal Control Policies and Procedures and any other standards,

  policies or procedures adopted by the Tribe, the Commission or the NIGC that

  govern the play of Covered Games; and

   2.  Examine revenues in connection with the conduct of Covered Games and

  shall include only those matters necessary to verify the determination of Net Win

  and the basis and amount of the Payments the Tribe is required to make to the

  State pursuant to Part XI of this Compact and as defined by this Compact.

Seminole Compact
Page 39

B.      A copy of the audit report for the conduct of Covered Games shall be

submitted to the Commission and the SCA within thirty (30) calendar days of

completion.  The SCA may continue the practice of providing information to the Office

of Economic and Demographic Research, or any successor entities, for use in estimating

gaming revenues pursuant to s. 216.136(3), Florida Statutes.  Representatives of the SCA,

including representatives of the coordinator of the Office of Economic and Demographic

Research of the Florida Legislature, or any successor entities, may, upon request, meet

with the Tribe and its auditors to discuss the audit or any matters in connection therewith;

provided, such discussions are limited to Covered Games information, including the

information specified in Section A.1 and A.2.  The annual independent audit shall be

performed by an independent firm, with experience in auditing casino operations,

selected by the State, subject to the consent of the Tribe, which shall not be unreasonably

withheld.  The Tribe shall pay the auditing firm for the costs of the annual independent

audit.

C.      As provided herein, the SCA may monitor the conduct of Covered Games

to ensure that the Covered Games are conducted in compliance with the provisions of this

Compact.  In order to properly monitor the conduct of Covered Games, personnel of the

SCA without prior notice shall have reasonable access to all public areas of the Facilities

related to the conduct of Covered Games as provided herein.

1.      While the Commission will act as the regulator of the Facilities, the SCA

may review whether the Tribe's Facilities are in compliance with the provisions of

this Compact and the Tribe's rules and regulations applicable to Covered Games

and may advise on such issues as it deems appropriate.  In the event of a dispute

or disagreement between Tribal and SCA regulators, the dispute or disagreement

shall be resolved in accordance with the dispute resolution provisions of Part XIII

of this Compact.

2.        In order to fulfill its oversight responsibilities, the State has identified

specific oversight testing procedures, set forth below in subsection 3, paragraphs

(a), (b), and (c), which the SCA may perform on a routine basis.

3.        (a)        The SCA may inspect any Covered Games in operation at the

Facilities on a random basis.  Such inspections shall not exceed one (1)

inspection per Facility per calendar month and each inspection shall be

limited to not more than sixteen (16) hours spread over two (2)

consecutive days.  The SCA may conduct inspections of more than sixteen

(16) hours spread over those two (2) consecutive days, if the SCA

determines that additional inspection hours are needed to address issues of

substantial non-compliance, provided that the SCA provides the Tribe

with written notification of the need for additional inspection hours and

provides the Tribe with a written summary of the substantial non-

compliance issues that need to be addressed during the additional

inspection hours.  There is an annual limit of One Thousand Six Hundred

(1,600) hours for all random inspections and audit reviews.  If the Tribe

adds additional facilities, as provided in Part IV, Section D, the annual

limit will be increased by Two Hundred Fifty (250) hours per additional

facility. Inspection hours shall be calculated on the basis of the actual

amount of time spent by the SCA conducting the inspections at a Facility

Seminole Compact
Page 41

without a multiple for the number of SCA inspectors or agents engaged in the inspection activities. The purpose of the random inspections is to confirm that the Covered Games operate and play properly pursuant to the manufacturer's technical standards and are conducted in compliance with the Tribe's Internal Control Policies and Procedures and any other standards, policies or procedures adopted by the Tribe, the Commission or the National Indian Gaming Commission which govern the play of Covered Games. The SCA shall provide notice to the Commission of such inspection at or prior to the commencement of the random inspections, and a Commission agent may accompany the inspection. The Tribe shall provide the SCA with a dedicated computer terminal at a Facility agreed to by the Tribe and the SCA by which SCA personnel will be able to access relevant electronic records.

(b)     For each Facility, the SCA may perform one annual review of the Tribe's slot machine compliance audit.

(c)     The Tribe shall have a separate compliance audit prepared for Sports Betting. The SCA may perform one annual review of the Tribe's compliance audit for Sports Betting.

(d)     At least on an annual basis, the SCA may meet with the Tribe's Internal Audit Department for Gaming to review internal controls and the record of violations of the same for each Facility as well as to review internal controls and the records of violations for the same associated with Sports Betting.

Seminole Compact
Page 42

4.      The SCA will seek to work with and obtain the assistance of the
Commission in the resolution of any conflicts with the management of the
Facilities, and the State and the Tribe shall make their best efforts to resolve
disputes through negotiation whenever possible.  Therefore, in order to foster a
spirit of cooperation and efficiency, the parties hereby agree that when disputes
arise between the SCA staff and Commission regulators from the day-to-day
regulation of the Facilities, they should generally be resolved first through
meeting and conferring in good faith.  This voluntary process does not proscribe
the right of either party to seek other relief that may be available when
circumstances require such relief.  In the event of a dispute or disagreement
between Tribal and SCA regulators, the dispute or disagreement shall be resolved
in accordance with the dispute resolution provisions of Part XIII of this Compact.

5.      Access to each Facility by the SCA shall be during the Facility's operating
hours only unless an inspection has already begun in which case the inspection
will be allowed to continue.  No advance notice is required when the SCA
inspection is limited to public areas of the Facility; however, representatives of
the SCA shall provide notice and photographic identification to the Commission
of their presence before beginning any such inspections.

6.      Before the SCA personnel enter any nonpublic area of a Facility, they
shall provide one (1) hour notice and photographic identification to the
Commission.  The SCA personnel shall be accompanied in nonpublic areas of the
Facility by a Commission officer.  Notice of at least one (1) hour by the SCA to

Seminole Compact
Page 43

the Commission is required to assure that a Commission officer is available to

accompany the SCA personnel at all times.

7.      Any suspected or claimed violations of this Compact or law shall be

directed in writing to the Commission; the SCA agents, in conducting the

functions assigned them under this Compact, shall not unreasonably interfere with

the functioning of any Facility.

D.      Subject to the provisions herein, agents of the SCA shall have the right to

review and request copies of Documents of the Facility related to its conduct of Covered

Games.  The review and copying of such Documents shall be during normal business

hours unless otherwise allowed by the Tribe at the Tribe's discretion.  The Tribe cannot

refuse said inspection and copying of such Documents, provided that the inspectors

cannot require copies of Documents in such volume that it unreasonably interferes with

the normal functioning of the Facilities or Covered Games.  To the extent that the Tribe

provides the State with information which the Tribe claims to be confidential and

proprietary, or a trade secret, the Tribe shall clearly mark such information with the

following designation: "Trade Secret, Confidential and Proprietary."  If the State receives

a request under Chapter 119, Florida Statutes that would include such designated

information, the State shall promptly notify the Tribe of such a request and the Tribe shall

promptly notify the State about its intent to seek judicial protection from disclosure.

Upon such notice from the Tribe, the State shall not release the requested information

until a judicial determination is made.  This designation and notification procedure does

not excuse the State from complying with the requirements of the State's public records

law, but is intended to provide the Tribe the opportunity to seek whatever judicial remedy

it deems appropriate. Notwithstanding the foregoing procedure, the SCA may provide

copies of tribal Documents to federal law enforcement and other State agencies or State

consultants that the State deems reasonably necessary in order to conduct or complete

any investigation of suspected criminal activity in connection with the Tribe's Covered

Games or the operation of the Facilities or in order to assure the Tribe's compliance with

this Compact.

E.     At the completion of any SCA inspection or investigation, the SCA shall

forward any written report thereof to the Commission, containing all pertinent, non-

confidential, non-proprietary information regarding any violation of applicable laws or

this Compact which was discovered during the inspection or investigation unless

disclosure thereof would adversely impact an investigation of suspected criminal activity.

Nothing herein prevents the SCA from contacting tribal or federal law enforcement

authorities regarding suspected criminal wrongdoing involving the Commission.

F.     Nothing in this Compact shall be deemed to authorize the State to regulate

the Tribe's government, including the Commission, or to interfere in any way with the

Tribe's selection of its governmental officers, including members of the Commission.

G.     Nothing herein shall be deemed to prevent the Tribe from entering into a

management contract as defined in 25 C.F.R. s. 502.15, or issuing a license following the

requirements of 25 C.F.R. s. 522.10; provided that the Tribe remains solely responsible

for the operation of Covered Games. For purposes of 25 C.F.R. s. 522.10, the State

agrees that the Tribe may license an entity to operate those Covered Games available to

the Tribe if the Commission makes a finding that the entity is qualified based on an

application and investigation similar to that required by s. 551.104(1), Florida Statutes,

Seminole Compact
Page 45

and determines the entity would not be ineligible for a license based on the criteria in s.

551.107(5)-(6), Florida Statutes.  The Tribe must provide the SCA sixty (60) calendar

days prior written notice before it enters into an agreement with a management contractor

or issues a license to a licensee, and shall only enter into a management contract with or

issue a license to an entity that is licensed to conduct gaming by another state regulatory

entity in the United States.

## Part IX.  JURISDICTION

The obligations and rights of the State and the Tribe under this Compact are

contractual in nature, and are to be construed in accordance with the laws of the State.

This Compact shall not alter tribal, federal or state civil adjudicatory or criminal

jurisdiction in any way, except as expressly provided herein.

## Part X.  LICENSING

The Tribe and the Commission shall comply with the licensing and hearing

requirements set forth in 25 C.F.R. Parts 556 and 558, as well as the applicable licensing

and hearing requirements set forth in the Seminole Tribal Gaming Code.  The

Commission shall notify the SCA of any disciplinary hearings or revocation or

suspension of licenses.

## Part XI.  PAYMENTS TO THE STATE OF FLORIDA

A.      The parties acknowledge and recognize that this Compact provides the

Tribe with partial but significant additional substantial exclusivity and other valuable

Seminole Compact
Page 46

consideration consistent with the goals of the Indian Gaming Regulatory Act, including special opportunities for tribal economic development through gaming within the external boundaries of Florida with respect to the play of Covered Games.  In consideration thereof, the Tribe covenants and agrees, subject to the conditions agreed upon in Part XII of this Compact, to make payments to the State derived from Net Win as set forth in Sections B, C, and E below ("Payments").

B.      Payments pursuant to Section A above shall be made to the State via electronic funds transfer in a manner directed by the Florida Legislature.  Of the amounts paid by the Tribe to the State, three (3) percent shall be distributed, as provided for by the Legislature, to those local governments (including both counties and municipalities) in Florida affected by the Tribe's operation of Covered Games.  Payments will be due in accordance with the Payment Schedule set forth below.

C.      Revenue Share Payments paid by the Tribe to the State shall be calculated as follows:

1.      The Tribe agrees to pay for each Revenue Sharing Cycle a Revenue Share Payment to the State equal to the amount calculated in accordance with paragraphs (a) through (k) below (the "Percentage Revenue Share Amount").

For Slot Machines, Raffles and Drawings and New Games

(a)      Twelve percent (12%) of all amounts up to and including Two Billion Dollars ($2,000,000,000) of Net Win received by the Tribe from the operation and play of Slot Machines, Raffles and Drawings and any new games permitted by the State, during each Revenue Sharing Cycle;

Seminole Compact
Page 47

(b)     Seventeen and one half percent (17.5%) of all amounts greater than

Two Billion Dollars ($2,000,000,000) up to and including Two Billion

Five Hundred Million Dollars ($2,500,000,000) of Net Win received by

the Tribe from the operation and play of Slot Machines, Raffles and

Drawings and any new games permitted by the State, during each Revenue

Sharing Cycle;

(c)     Twenty percent (20%) of all amounts greater than Two Billion

Five Hundred Million Dollars ($2,500,000,000) up to and including Three

Billion Dollars ($3,000,000,000) of Net Win received by the Tribe from

the operation and play of Slot Machines, Raffles and Drawings and any

new games permitted by the State, during each Revenue Sharing Cycle;

(d)     Twenty-two and one-half percent (22.5%) of all amounts greater

than Three Billion Dollars ($3,000,000,000) up to and including Three

Billion Five Hundred Million Dollars ($3,500,000,000) of Net Win

received by the Tribe from the operation and play of Slot Machines,

Raffles and Drawings and any new games permitted by the State, during

each Revenue Sharing Cycle; and

(e)     Twenty-five percent (25%) of all amounts greater than Three

Billion Five Hundred Million Dollars ($3,500,000,000) of Net Win

received by the Tribe from the operation and play of Slot Machines,

Raffles and Drawings and any new games permitted by the State, during

each Revenue Sharing Cycle;

For Table Games

(f)     Fifteen percent (15%) of all amounts up to and including One Billion Dollars ($1,000,000,000) of Net Win received by the Tribe from the operation and play of Table Games, during each Revenue Sharing Cycle;

(g)     Seventeen and one half percent (17.5%) of all amounts greater than One Billion Dollars ($1,000,000,000) up to and including One Billion Five Hundred Million Dollars ($1,500,000,000) of Net Win received by the Tribe from the operation and play of Table Games, during each Revenue Sharing Cycle;

(h)     Twenty-two and one-half percent (22.5%) of all amounts greater than One Billion Five Hundred Million Dollars ($1,500,000,000) up to and including Two Billion Dollars ($2,000,000,000) of Net Win received by the Tribe from the operation and play of Table Games, during each Revenue Sharing Cycle; and

(i)     Twenty-five percent (25%) of all amounts greater than Two Billion Dollars ($2,000,000,000) of Net Win received by the Tribe from the operation and play of Table Games, during each Revenue Sharing Cycle;

For Sports Betting

(j)     Thirteen and three-quarter percent (13.75%) of Net Win received by the Tribe from the operation and play of Sports Betting, during each Revenue Sharing Cycle, excluding the Net Win received by the Tribe on all such wagering by Patrons who access the Tribe's wagering platform via

software that uses a brand of a Qualified Pari-mutuel Permitholder

pursuant to Part III, Section CC.3; and

(k)     Ten percent (10%) of Net Win received by the Tribe from the

operation and play of Sports Betting, during each Revenue Sharing Cycle,

on such wagering by Patrons who access the Tribe's wagering platform via

software that uses a brand of a Qualified Pari-mutuel Permitholder

pursuant to Part III, Section CC.3.

2.     Monthly Payment of Revenue Share Payments

(a)     On or before the fifteenth (15th) day of the month following each

month of the Revenue Sharing Cycle, the Tribe will remit to the State or

its assignee the Monthly Payment.  For purposes of this Section, the

Monthly Payment shall be eight and one-third percent (8.333%) of the

estimated Revenue Share Payment to be paid by the Tribe during such

Revenue Sharing Cycle.

(b)     The Tribe shall, on a quarterly basis, internally "true up" the

calculation of the estimated Revenue Share Payment, based on the Tribe's

quarterly, audited financial statements related to Covered Games, relative

to the previous estimated Revenue Share Payment for the Revenue

Sharing Cycle.

(c)     The Tribe will make available to the State at the time of the

quarterly true-up the basis for the calculation of the payment.

3.     Payment Verification

Seminole Compact
Page 50

(a)    (i)    On or before the forty-fifth (45th) day after the third (3rd) month, sixth (6th) month, ninth (9th) month, and twelfth (12th) month of each Revenue Sharing Cycle, provided that the twelve (12) month period does not coincide with the Tribe's fiscal year end date as indicated in Section C.3.(b) of this Part, the Tribe will provide the State with an audit report by its independent auditors as to the annual Revenue Share calculation.

    (ii)    For each quarter within any Revenue Sharing Cycle, the Tribe agrees to engage its independent auditors to conduct a review of the un-audited net revenue from Covered Games.  On or before the one hundred twentieth (120th) day after the end of the Tribe's fiscal year, the Tribe agrees to require its independent auditors to provide an audit report with respect to Net Win for Covered Games and the related payment of the annual Revenue Share Payment for each Revenue Sharing Cycle to the SCA for State review.

(b)    If the twelfth (12th) month of the Revenue Sharing Cycle does not coincide with the Tribe's fiscal year, the Tribe agrees to require its independent auditors to deduct Net Win from Covered Games for any of the months that are outside of the Revenue Sharing Cycle and to include Net Win from Covered Games for those months which fall outside of the Tribe's audit period but fall within the Revenue Sharing Cycle, prior to issuing the audit report.

Seminole Compact
Page 51

(c)      No later than thirty (30) calendar days after the day the audit report
is issued, the Tribe will remit to the State any underpayment of the annual
Revenue Share, and the State will either reimburse to the Tribe any
overpayment of the annual Revenue Share Payment for each Revenue
Sharing Cycle or authorize the overpayment to be deducted from the next
successive Monthly Payment or Payments.

4.      Guaranteed Minimum Compact Term Payment

(a)      The total Revenue Share Payments paid by the Tribe to the State
pursuant to Section C.1 of this Part shall not be less than One Billion Five
Hundred Million Dollars ($1,500,000,000) by the end of the third (3rd)
Revenue Sharing Cycle and Two Billion Five Hundred Million Dollars
($2,500,000,000) by the end of the fifth (5th) Revenue Sharing Cycle.

(b)      If the total Revenue Share Payments paid by the Tribe to the State
pursuant Section C.1 of this Part is less than One Billion Five Hundred
Million Dollars ($1,500,000,000) by the end of the third (3rd) Revenue
Sharing Cycle and/or less than Two Billion Five Hundred Million Dollars
($2,500,000,000) by the end of the fifth (5th) Revenue Sharing Cycle, then
the Tribe shall pay such shortfall to the State within thirty (30) calendar
days after the last day of the third (3rd) and/or fifth (5th) Revenue Sharing
Cycle, as applicable.

(c)      Notwithstanding the foregoing, the Revenue Share Payments paid
by the Tribe to the State pursuant to Section C.1 of this Part shall not be

less than Four Hundred Million Dollars ($400,000,000) for any Revenue

Sharing Cycle during the first five (5) years of this Compact.

(d)      Upon the occurrence of certain events beyond the Tribe's control,

including acts of God, war, terrorism, pandemic, fires, floods, or accidents

causing closure for more than three (3) days, significant reduction in

business for more than three (3) days, or destruction of one or more of its

Facilities or property necessary to operate the Facility or Facilities, the

Tribe's obligation to pay the Guaranteed Minimum Compact Term

Payment described above shall be reduced pro rata to reflect the

percentage of the total Net Win lost to the Tribe from the impacted

Facility or Facilities.

(e)      The Tribe's obligation to make the Guaranteed Minimum Compact

Term Payment shall cease (i) if the State violates the Tribe's exclusivity

and the State fails to cure such violation within 180 days after notice of

such breach by the Tribe, or (ii) if the Tribe's authorization to conduct the

Covered Games is invalidated, in whole or in part, as a result of a court

decision; provided, if at any time the Tribe is not legally permitted to offer

Sports Betting as described in this Compact, including to Patrons

physically located in the State but not on Indian Lands, or the Tribe loses

the exclusive right to offer Sports Betting as provided in Part XII, Sections

A.3.(a) or B.1, then the Tribe's obligation to pay the full Guaranteed

Minimum Compact Term Payment and the other minimum payments set

forth in this Section shall be reduced by ten (10) percent.

Seminole Compact
Page 53

D.      The Annual Oversight Assessment, which shall not exceed Six Hundred

Thousand Dollars ($600,000) per year, indexed for inflation as determined by the

Consumer Price Index, shall be determined and paid in quarterly installments within

thirty (30) calendar days of receipt by the Tribe of an invoice from the SCA.  Such

assessment may be used by the State for the operation of the SCA.  If the Tribe adds

additional facilities, as provided in Part IV, Section D, the Annual Oversight Assessment

will be increased by One Hundred Fifty Thousand Dollars ($150,000) per year, indexed

for inflation as determined by the Consumer Price Index, per additional facility.  The

Tribe reserves the right to audit the invoices on an annual basis, a copy of which will be

provided to the SCA, and any discrepancies found therein shall be reconciled within

forty-five (45) calendar days of receipt of the audit by the SCA.

E.      The Tribe shall make an annual donation to the Florida Council on

Compulsive Gaming or to another provider from which the State procures services

pursuant to section 551.118, Florida Statutes, as an assignee of the State in an amount not

less than Two Hundred Fifty Thousand Dollars ($250,000) per Facility; provided that if a

Facility operates less than three hundred sixty-five (365) days in a year, the amount of the

annual donation as to such Facility will be calculated by dividing the number of days

during the year that the Facility was open by three hundred sixty-five (365) and

multiplying the result by Two Hundred Fifty Thousand Dollars ($250,000).

F.      On the Effective Date of this Compact, any moneys remitted by the Tribe

before the Effective Date of this Compact shall be released to the State without further

claim, obligation or encumbrance.

Seminole Compact
Page 54

G.      Except as expressly provided in this Part, nothing in this Compact shall be deemed to require the Tribe to make payments of any kind to the State or any of its agencies.

Part XII.  GRANT OF EXCLUSIVITY; REDUCTION OF TRIBAL PAYMENTS BECAUSE OF LOSS OF EXCLUSIVITY OR OTHER CHANGES IN FLORIDA LAW

The intent of this Part is to provide the Tribe with the right to operate Covered Games on an exclusive basis throughout the State, subject to the exceptions and provisions set forth below, without State-authorized competition from other persons, organizations, or entities offering Class III Gaming or Other Casino-Style Gaming.

A.      1.      If, after January 1, 2021, Florida law is amended by action of the Florida Legislature or, except pursuant to Section A.3 of this Part, by an amendment adopted to the Florida Constitution to allow (1) the operation of Class III Gaming or Other Casino-Style Gaming at any location under the jurisdiction of the State that was not in operation as of January 1, 2021, other than as provided in Part XII, Section B.2, or (2) new forms of Class III Gaming or Other Casino-Style Gaming that were not in operation as of January 1, 2021, the Payments due to the State pursuant to Part XI, Sections C and E of this Compact shall cease when the newly authorized gaming begins to be offered for public or private use.  Nothing in this provision limits the State's ability to invoke the dispute resolution process set forth in Part XIII to challenge the Tribe's claim that the State violated its exclusivity.  The cessation of payments due to the State pursuant to Part XI,

Sections C and E of this Compact shall continue until such gaming is no longer operated, in which event the Payments shall resume.

2.      If an expansion of new Class III Gaming or Other Casino-Style Gaming is implemented as a result of a court decision or administrative ruling or decision without specific authorization by the Florida Legislature after January 1, 2021, and the newly authorized gaming begins to be offered for public or private use as a result of such decision, then the Tribe shall make its Payments due to the State pursuant to Part XI, Sections C and E of this Compact into an escrow account to provide the Florida Legislature with the opportunity to pass legislation to reverse such decision or ruling.  Nothing in this provision limits the State's ability to invoke the dispute resolution process set forth in Part XIII to challenge the Tribe's claim that the State violated its exclusivity.  If the Florida Legislature fails to act or if such Class III Gaming or Other Casino-Style Gaming is not illegal and no longer operated after action by the Florida Legislature within fifteen (15) months after the Tribe's notice of such expanded gaming or, if the State challenges such claim using the dispute resolution process set forth in Part XIII, within twelve (12) months after the conclusion of the dispute resolution process, whichever is later, then all funds in the escrow account shall be returned to the Tribe and all further Payments due to the State pursuant to Part XI, Sections C and E of this Compact shall cease or be reduced as provided in Part XII, Section B until such gaming is no longer operated, in which event the Payments shall resume.  Nothing herein shall be construed to grandfather or otherwise permit any violation of the Tribe's exclusivity that occurred prior to the Effective Date of this Compact, as

long as the Tribe provides notice to the State of such violation if the violation is

known by the Tribe prior to the Effective Date.

3.  If after January 1, 2021, the Florida Constitution is amended, without

action by the Legislature, by an initiative pursuant to Article XI, s. 3 to authorize:

(a)  Sports Betting, other than at a Tribal Facility as specified in this

Compact, then the Tribe shall make payments to the State for all future

Revenue Sharing Cycles based on the percentage payments set forth in

Part XI, Section C but shall be permitted, when the newly authorized

Sports Betting begins to be offered for public or private use, to reduce its

payments due to the State on the Net Win on Covered Games by

excluding Net Win from Sports Betting.

(b)  Class III Gaming or Other Casino-Style Gaming, excluding Sports

Betting and any form of online or remote gaming, at any location less than

one hundred (100) miles on a straight line from a Tribal Facility, other

than the relocation of a pari-mutuel license or permit which may be

transferred, relocated, or moved pursuant to Part XII, Section B.2, then the

Tribe shall make payments to the State for all future Revenue Sharing

Cycles based on the percentage payments set forth in Part XI, Section C

but shall be permitted, when the newly authorized expanded gaming

begins to be offered for public or private use, to reduce its payments due

to the State on the Net Win on Covered Games by excluding the Net Win

(other than on Sports Betting) from any Facility within one hundred (100)

miles of the new location where the Class III Gaming or Other Casino-

Seminole Compact
Page 57

Style Gaming is offered.  If the Florida Constitution is amended, without

action by the Legislature, by an initiative pursuant to Article XI, s. 3 to

authorize Class III Gaming or Other Casino-Style Gaming, excluding

Sports Betting and any form of online or remote gaming, at any location

more than one hundred (100) miles on a straight line from a Facility, the

Tribe's exclusivity under this Part is not violated.

B.      Exceptions: The following are exceptions to the exclusivity provisions of

Section A above.

1.      Any Class III Gaming or Other Casino-Style Gaming authorized by a

compact between the State and any other federally recognized tribe pursuant to

Indian Gaming Regulatory Act, provided that the tribe has land in federal trust in

the State as of January 1, 2021.  However, if such tribe is permitted to offer Sports

Betting to players physically located in the State but not on Indian Lands, then the

Tribe shall make payments to the State for all future Revenue Sharing Cycles

based on the percentage payments set forth in Part XI, Section C but shall be

permitted, when the newly authorized Sports Betting begins to be offered for

public or private use, to reduce its Revenue Share Payments due to the State by

excluding twenty five (25) percent of its Net Win from Sports Betting, but

Revenue Share Payments shall be calculated based on no less than ten (10)

percent of Net Win received by the Tribe from the operation and play of Sports

Betting during each Revenue Sharing Cycle, including the Net Win received by

the Tribe on all such wagering by Patrons who access the Tribe's wagering

platform via software that uses a brand of a Qualified Pari-mutuel Permitholder
pursuant to Part III, Section CC.3.

2.  (a)  The operation of Slot Machines, which does not include any game
played with tangible playing cards, at each of the four (4) currently
operating licensed pari-mutuel facilities in Broward County or at the four
(4) currently operating licensed pari-mutuel facilities in Miami-Dade
County, whether or not currently operating Slot Machines, provided that
such licenses are not transferred or otherwise used to move Slot Machines
without the Tribe's written consent to any location in a county other than
Broward County or Miami-Dade County where the new location is within
one hundred (100) miles on a straight line from any Facility, or without
the Tribe's written consent to any location in either Broward County or
Miami-Dade County where the new location is within fifteen (15) miles
on a straight line from any Facility in Broward County. Scientific testing
and evaluation of Slot Machines required by State law must be conducted
by an Independent Testing Laboratory. Slot Machines may not offer
games using tangible playing cards (e.g., paper or plastic), but may offer
games using electronic or virtual cards.

(b)  If State law is changed to authorize the operation of more than two
thousand (2,000) Slot Machines at any of the four (4) licensed pari-mutuel
facilities in Broward County or the four (4) licensed pari-mutuel facilities
in Miami-Dade County, which are authorized to operate Slot Machines,
then the Tribe shall make payments to the State for all future Revenue

Sharing Cycles based on the percentage payments set forth in Part XI,

Section C but shall be permitted, when the newly authorized expanded

gaming begins to be offered, to reduce its payments due to the State on the

Net Win by excluding fifty (50) percent of the Net Win received by the

Tribe from the operation and play of Slot Machines at its Facilities in

Broward County.   The reduction of payments due to the State pursuant to

Part XI, Section C and E of this Compact shall continue until State law is

changed so that the maximum number of Slot Machines which may be

operated at any of the four (4) licensed pari-mutuel facilities in Broward

County or any of the four (4) licensed pari-mutuel facilities in Miami-

Dade County is two thousand (2,000) or fewer Slot Machines at each

location, in which event the Payments shall resume effective on the first

(1st) day of the first (1st) calendar month after the State law restoring the

limit of two thousand (2,000) Slot Machines per location becomes

effective.

3.      The operation of a combined total of not more than Three Hundred Fifty

(350) Historic Racing Machines, connected to a central server at that facility, and

Electronic Bingo Card Minders, both as defined in Part III, at each pari-mutuel

facility licensed as of January 1, 2021, and not located in either Broward County

or Miami-Dade County.

4.      The operation of Pari-Mutuel Wagering Activities at pari-mutuel facilities

licensed by the State.

5.      The operation of poker at cardrooms licensed by the State, but not including any game banked by the house, a player or any other person or entity. Notwithstanding the foregoing, a poker game played in the designated player manner, as authorized by the State prior to the enactment of Article X, s. 30 of the Florida Constitution, where one player is permitted but not required to cover other players' wagers, shall not be considered a violation of the Tribe's exclusivity if the following restrictions are enacted in state law and implemented by rule, if appropriate, prior to, or within twelve (12) months following the Effective Date of this Compact: (a) each cardroom is restricted to offering only those specific designated player card games that were identified in cardroom license applications approved by the SCA on or before March 15, 2018, and any substantially similar poker games that were identified in cardroom license applications approved by the SCA on or before April 1, 2021; (b) no cardroom is permitted to offer more than (i) ten (10) designated player card tables, if the cardroom is located in a county where Slot Machines are operated, or (ii) thirty (30) designated player card tables, if the cardroom is not located in a county where Slot Machines are operated; (c) no cardroom operator has any direct economic interest in a designated player game except for the rake; and (d) no cardroom operator receives any portion of the designated player's winnings. Notwithstanding the foregoing, if the operation of all designated player card games ceases, then for so long as all such games remain out of operation, the Tribe agrees to increase each of the revenue share percentages set forth in Part XI, Section C.1 by one percent (1%).

6.　　The operation of Class III Gaming or Other Casino-Style Gaming,

excluding Sports Betting or any form of online or remote gaming, at any location

not less than one hundred (100) miles on a straight line from any Facility.

7.　　The operation by the Florida Department of Lottery of those types of

lottery games authorized under chapter 24, Florida Statutes, including any

technologic enhancements for lottery games, but not technologic enhancements

that would allow  (i) any player-activated or operated machine or device other

than a Lottery Vending Machine such as video lottery terminals (VLTs), (ii) any

banked or banking card or table game, (iii) any type of wagering on any

professional sport or athletic event, any Olympic or international sports

competition event, any collegiate sport or athletic event, or any motor vehicle

race, or any portion of any of the foregoing, or (iv) any type of online or remote

type of Class III Gaming or Other Casino-Style Gaming.  A "player-activated or

operated machine or device" does not include an electronic device connected via

the Internet or otherwise to web applications or websites approved by or operated

by the Florida Department of the Lottery which: (i) allows a player or user the

ability to scan a play slip for a draw game for presentation to a lottery retailer to

enable the player or user to purchase a paper ticket at a lottery retailer's physical

location; (ii) communicates the winning numbers for draw lottery games to a

player or user; or (iii) facilitates the purchase of a paper lottery ticket.  However,

not more than ten (10) Lottery Vending Machines may be installed at any facility

or location and no Lottery Vending Machine that dispenses electronic instant

tickets as described in Part III, Section R.2 may be installed at any licensed pari-mutuel facility.

8.      Except as otherwise provided, the operation of games authorized by chapters 546 and 849, Florida Statutes, on January 1, 2021.  In addition, hand-held or table-top bingo card minders may be used in connection with the play of bingo games authorized by s.  849.0931, Florida Statutes, as of January 1, 2021.  Bingo card minders must require players to input manually each individual number or symbol announced by a live caller.  Further, no bingo card minder may display or represent the game result through any means, including, but not limited to, video or mechanical reels or other slot machine or casino game themes, other than highlighting the winning numbers or symbols marked or covered on the tangible bingo cards or giving an audio alert that the player's card has a prize-winning pattern.

9.      The operation of Fantasy Sports Contests.

10.     The provision of marketing services by a Qualified Pari-mutuel Permitholder pursuant to a written agreement with the Tribe associated with the Tribe's operation of Sport Betting.

11.     Expanded gaming conducted pursuant to an amendment to the Florida Constitution approved by an initiative pursuant to Article XI, s. 3 that is funded in whole or in part by the Tribe.

C.      To the extent that the exclusivity provisions of this Part are breached or otherwise violated and the Tribe's ongoing payment obligations to the State pursuant to Part XI, Sections C and E of this Compact cease, any outstanding payments that would

Seminole Compact
Page 63

have been due the State from the Tribe's Facilities prior to the breach/violation shall be made within thirty (30) business days after the breach/violation.

D.     The breach of this Part's exclusivity provisions and the cessation of Payments pursuant to Part XI, Sections C and E of this Compact shall not excuse the Tribe from continuing to comply with all other provisions of this Compact, including continuing to pay the State the Annual Oversight Assessment as set forth in Part XI, Section D of this Compact.

E.     The Tribe acknowledges that the following event shall not trigger any remedy under this Compact and does not affect the exclusivity provisions of this Compact: Any change to the tax rate paid to the State by licensed pari-mutuel permitholders for the operation of Slot Machines as recognized by Section B.2 of this Part, if the effective tax rate on "slot machine revenues," as that term is defined in s. 551.102(13), Florida Statutes, is not less than thirty (30) percent; provided any such change is not enacted earlier than during the 2023 Regular Session of the Florida Legislature.  If the effective tax rate of "slot machine revenue," as that term is defined in s. 551.102(13), Florida Statutes, falls below thirty (30) percent or a reduced tax is enacted prior to the 2023 Regular Session of the Florida Legislature, then the Tribe shall make payments to the State for all future Revenue Sharing Cycles based on the percentage payments set forth in Part XI, Section C but shall be permitted to exclude fifty (50) percent of the revenue generated by Slot Machines at its Facilities in Broward County until the tax rate is restored to its previous rate.

F.     The Tribe agrees to work with the State in good faith to address possible violations of the Tribe's exclusivity.

AR082

Seminole Compact
Page 64

Part XIII.  DISPUTE RESOLUTION

In the event that either party to this Compact believes that the other party has failed to comply with any requirements of this Compact, or in the event of any dispute hereunder, including, but not limited to, a dispute over the proper interpretation of the terms and conditions of this Compact, the goal of the Parties is to resolve all disputes amicably and voluntarily whenever possible.  In pursuit of this goal, the following procedures shall be invoked:

A.      A party asserting noncompliance or seeking an interpretation of this Compact first shall serve written notice on the other party.  The notice shall identify the specific Compact provision alleged to have been violated or in dispute and shall specify in detail the asserting party's contention and any factual basis for the claim. Representatives of the Tribe and State shall meet within thirty (30) calendar days of receipt of notice in an effort to resolve the dispute, unless they mutually agree to extend this period;

B.      A party asserting noncompliance or seeking an interpretation of this Compact under this Part shall certify that to the best of the party's knowledge, information, and belief formed after reasonable inquiry, the claim of noncompliance or the request for interpretation of this Compact is warranted and made in good faith and not for any improper purpose, such as to harass or to cause unnecessary delay or the needless incurring of the cost of resolving the dispute;

C.      If the parties are unable to resolve a dispute through the process specified in Sections A and B of this Part, either party can call for mediation under the Commercial

Mediation Procedures of the American Arbitration Association (AAA) or any such successor procedures, provided that such mediation does not last more than sixty (60) calendar days, unless an extension to this time limit is agreed to by the parties.  The disputes available for resolution through mediation are limited to matters arising under the terms of this Compact.   If the parties are unable to resolve a dispute through the process specified in Sections A, B, and C of this Part, notwithstanding any other provision of law, either party may bring an action in a United States District Court ("federal court") having venue regarding any dispute arising under this Compact.  If the federal court declines to exercise jurisdiction, or federal precedent exists that holds that the federal court would not have jurisdiction over such a dispute, either party may bring the action in the appropriate court of the Seventeenth Judicial Circuit in Broward County, Florida.  The parties are entitled to all rights of appeal permitted by law in the court system in which the action is brought;

D.       For purposes of actions based on disputes between the State and the Tribe that arise under this Compact and the enforcement of any judgment resulting therefrom, the Tribe and the State each expressly waives its right to assert sovereign immunity from suit and from enforcement of any ensuing judgment, and further consents to be sued in federal or state court, including the rights of appeal specified above, as the case may be, provided that:

1.       The dispute is limited solely to issues arising under this Compact;

2.       There is no claim for monetary damages, except that payment of any money required by the terms of this Compact, as well as injunctive relief or

Seminole Compact
Page 66

specific performance enforcing a provision of this Compact requiring the payment of money to the State may be sought; and

3.      Nothing herein shall be construed to constitute a waiver of the sovereign immunity of the Tribe with respect to any third party that is made a party or intervenes as a party to the action.  In the event that intervention, joinder, or other participation by any additional party in any action between the State and the Tribe would result in the waiver of the Tribe's sovereign immunity as to that additional party, the waiver of the Tribe provided herein may be revoked;

E.      The State may not be precluded from pursuing any mediation or judicial remedy against the Tribe on the grounds that the State has failed to exhaust its Tribal administrative remedies; and

F.      Notwithstanding anything to the contrary in this Part, any failure of the Tribe to remit the Payments pursuant to the terms of Part XI will entitle the State to seek injunctive relief in federal or state court, at the State's election, to compel the Payments after exhausting the dispute resolution process in Sections A and B of this Part.


Part XIV.  CONSTRUCTION OF COMPACT; SEVERANCE; FEDERAL APPROVAL

A.      Each provision, section, and subsection of this Compact shall stand separate and independent of every other provision, section, or subsection, and shall be interpreted to ensure compliance with IGRA.  In the event that a federal district court in Florida or other court of competent jurisdiction shall find any provision, section, or subsection of this Compact to be invalid, the remaining provisions, sections, and subsections of this Compact shall remain in full force and effect, provided that severing

Seminole Compact
Page 67

the invalidated provision, section or subsection does not undermine the overall intent of the parties in entering into this Compact. However, except as set forth below, if either Part XI or Part XII is held by a court of competent jurisdiction to be invalid, this Compact will become null and void at the option of either the Tribe or the State. If at any time the Tribe is not legally permitted to offer Sports Betting as described in this Compact, including to Patrons physically located in the State but not on Indian Lands, then the Compact will not become null and void, but the Tribe will be relieved of its obligation to pay the full Guaranteed Minimum Compact Term Payment, as explained in Part XI, Section C.4(e). However, Payments due to the State pursuant to Part XI, Sections C and E of this Compact shall continue.

B.     It is understood that Part XII of this Compact, which provides for a cessation of the Payments to the State under Part XI, does not create any duty on the State of Florida, including a duty to enforce the law against illegal activity, but only a remedy for the Tribe if gaming under state jurisdiction is expanded by affirmative action of the State.

C.     This Compact, together with all documents referenced herein, sets forth the full and complete agreement of the Parties and subject to the terms hereof supersedes any prior oral or written understandings with respect to the subject matter hereof.

D.     This Compact is intended to meet the requirements of the Indian Gaming Regulatory Act as of the Effective Date of this Compact, and where reference is made to the Indian Gaming Regulatory Act, or to an implementing regulation thereof, the reference is deemed to have been incorporated into this document as if set forth in full. Subsequent changes to the Indian Gaming Regulatory Act that diminish the rights of the

Seminole Compact
Page 68

State or Tribe may not be applied retroactively to alter the terms of this Compact, except

to the extent that Federal law validly mandates retroactive application without the

respective consent of the State or Tribe. In the event that a subsequent change in the

Indian Gaming Regulatory Act, or to an implementing regulation thereof, mandates

retroactive application without the respective consent of the State or Tribe, the parties

agree that this Compact is voidable by either party only if the subsequent change

materially alters the provisions in the Compact relating to the play of Covered Games,

revenue sharing payments, suspension or reduction of payments, or exclusivity.

E.       Neither the presence in another state-tribal compact of language that is not

included in this Compact, nor the absence in this Compact of language that is present in

another state-tribal compact shall be a factor in construing the terms of this Compact.

F.       Each party hereto agrees to defend the validity of this Compact.

G.       The parties shall cooperate in seeking approval of this Compact from the

Secretary of the Interior and the parties further agree that, upon execution and ratification

by the Florida Legislature, the Tribe and the State shall work together to submit the

Compact to the Secretary forthwith.


Part XV.  NOTICES

All notices required under this Compact shall be given by certified mail, return

receipt requested, commercial overnight courier service, or personal delivery, to the

following persons:

Seminole Compact
Page 69

**The Governor**
400 South Monroe Street
PL-05, The Capitol
Tallahassee, Florida 32301

**General Counsel to the Governor**
400 South Monroe Street
Room 209, The Capitol
Tallahassee, Florida 32301

**Chairman**
Seminole Tribe of Florida
6300 Stirling Road
Hollywood, Florida 33024

**General Counsel to the Tribe**
Seminole Tribe of Florida
6300 Stirling Road
Hollywood, Florida 33024

**President of the Florida Senate**
409 The Capitol
404 South Monroe Street
Tallahassee, Florida 32399-1100

**Speaker of the Florida House of Representatives**
420 The Capitol
402 South Monroe Street
Tallahassee, Florida 32399-1300

Part XVI. EFFECTIVE DATE AND TERM

A.    This Compact, if approved by the Florida Legislature and approved as a

tribal-state compact within the meaning of the Indian Gaming Regulatory Act either by

action of the U.S. Secretary of the Interior or by operation of law under 25 U.S.C. s.

2710(d)(8), shall become effective upon publication of a notice of approval in the Federal

Register under 25 U.S.C. s. 2710(d)(8)(D).

B.    This Compact shall terminate on July 31, 2051.

Seminole Compact
Page 70

Part XVII.  AMENDMENT OF COMPACT AND REFERENCES

      A.    Amendment of this Compact may only be made by written agreement of the parties, subject to approval by the U.S. Secretary of the Interior either by publication of the notice of approval in the Federal Register or by operation of law under 25 U.S.C. s. 2710(d)(8).

      B.    Ratification by the Legislature is required for any amendment to the Compact that alters the provisions relating to Covered Games, the amount of revenue sharing payments, suspension or reduction in payments, or exclusivity.

      C.    Changes in the provisions of tribal ordinances, regulations and procedures referenced in this Compact may be made by the Tribe and shall be provided to the SCA within fourteen (14) calendar days of becoming effective.  If the State has an objection to any change to the tribal ordinance, regulation or procedure that is the subject of the notice on the ground that its adoption is a violation of the Tribe's obligations under this Compact, the State may invoke the dispute resolution provisions provided in Part XIII of this Compact.

Part XVIII.  MISCELLANEOUS

      A.    The State and the Tribe agree to engage in good faith negotiations within thirty-six (36) months after the Effective Date of this Compact to consider an amendment to authorize the Tribe to offer all types of Covered Games online or via mobile devices to players physically located in the State, where such wagers made using a mobile device or online shall be deemed to take place exclusively where received at the location of the

servers or other devices used to conduct such wagering activity at a Facility on Indian Lands.  Any dispute over whether a party has engaged in good faith negotiations under this Part shall not be subject to suit pursuant to Part XIII, and this Part is not a waiver of the State's sovereign immunity from suit over claims alleging the failure to negotiate in good faith, as recognized in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996).

B.      Except as set forth in Part XII, Section A.3(a), if the State permits any other person or entity to offer any form of online or remote gaming, then the Tribe shall be permitted to accept wagers on the same, specific form of gaming from players physically located within the State using mobile or other electronic devices and such wagers shall be deemed to take place exclusively where received at the location of the servers or other devices used to conduct such wagering activity at a Facility on Indian Lands.  If the State revokes its permission to the person or entity to offer any form of online or remote gaming, then the Tribe's coextensive authorization in this Section is also revoked.

C.      Except to the extent expressly provided in this Compact, this Compact is not intended to, and shall not be construed to, create any right on the part of a third party to bring an action to enforce any of its terms.

D.      If, after the Effective Date of this Compact, the State enters into a Compact with any other Tribe that contains more favorable terms with respect to the provisions of this Compact and the Secretary of the Interior approves such compact, either by publication of the notice of approval in the Federal Register or by operation of law under 25 U.S.C. s. 2710(d)(8), upon tribal notice to the State and the Secretary, this Compact shall be deemed amended to contain the more favorable terms, unless the State

Seminole Compact
Page 72

objects to the change and can demonstrate, in a proceeding commenced under Part XIII,

that the terms in question are not more favorable.

E.    Smoking

The Tribe and the State recognize that opportunities to engage in gaming in

smoke-free or reduced-smoke environments provide both health and other benefits to

Patrons, and the Tribe has already instituted a non-smoking section at all of its Facilities.

As part of its continuing commitment to this issue, the Tribe will:

1.    Install and utilize a ventilation system at all new construction at its

Facilities, which system exhausts tobacco smoke to the extent reasonably feasible

under existing state-of-the-art technology;

2.    Designate a smoke-free area for Covered Games at all new construction at

its Facilities and at all of its new Facilities;

3.    Install non-smoking, vented tables for Covered Games installed in its

Facilities sufficient to reasonably respond to demand for such tables; and

4.    Designate a non-smoking area for gaming within all of its Facilities.

F.    The annual average minimum pay-out of all Slot Machines in each

Facility shall not be less than eighty-five percent (85%).

G.    Nothing in this Compact shall alter any of the existing memoranda of

understanding, contracts, or other agreements entered into between the Tribe and any

other federal, state, or local governmental entity.

H.    The Tribe currently has as set forth in its Employee Fair Treatment and

Dispute Resolution Policy, and agrees to maintain, standards that are comparable to the

standards provided in federal laws and State laws forbidding employers from

Seminole Compact
Page 73

discrimination in connection with the employment of persons working at the Facilities on

the basis of race, color, religion, national origin, gender, age, disability/handicap, or

marital status.  Nothing herein shall preclude the Tribe from giving preference in

employment, promotion, seniority, lay-offs, or retention to members of the Tribe and

other federally recognized tribes.

I.     The Tribe shall, with respect to any Facility where Covered Games are

played, adopt and comply with tribal requirements that meet the same minimum state

requirements applicable to Florida businesses with respect to environmental and building

standards, except for any standards concerning smoking in Section E of this Part.

Seminole Compact
Page 74

Part XIX. EXECUTION

The Governor of the State of Florida affirms that he has authority to act for the State in this matter and that after approval by the Florida Legislature, no further action by the State or any State official is necessary for this Compact to take effect upon federal approval by action of the U.S. Secretary of the Interior or by operation of law under 25 U.S.C. s. 2710(d)(8) upon publication of the notice of approval in the Federal Register. The Governor also affirms that he will take all appropriate steps to effectuate its purposes and intent. The undersigned Chairman of the Tribal Council of the Seminole Tribe of Florida affirms that he is duly authorized and has the authority to execute this Compact on behalf of the Tribe. The Chairman also affirms that he will take all appropriate steps to effectuate its purposes and intent.

APPROVED:

State of Florida

Ron DeSantis
Governor

Date: 23 April, 2021

Seminole Tribe of Florida

Marcellus W. Osceola, Jr.
Chairman of the Tribal Council

Date: 4/83/, 2021

## AMENDMENT TO THE 2021 GAMING COMPACT BETWEEN THE SEMINOLE TRIBE OF FLORIDA AND THE STATE OF FLORIDA

The 2021 Gaming Compact Between the Seminole Tribe of Florida and the State of Florida ("Compact") was executed on April 23, 2021.  The State of Florida ("State") and the Seminole Tribe of Florida ("Tribe") agree to the following amendments to the Compact:

1.  Part XVIII.A is deleted in its entirety and replaced with "Reserved."

2.  The Tribe agrees that it will not commence Sports Betting, as defined in Part III.CC, prior to October 15, 2021.

APPROVED:

State of Florida

Date: **MAY 17** , 2021

Ron DeSantis
Governor

Seminole Tribe of Florida

Date: May 17 , 2021

Marcellus W. Osceola, Jr.
Chairman of the Tribal Council

AR094

# Tribal Council Resolution

RE:   2021 GAMING COMPACT AND AMENDMENT BETWEEN THE SEMINOLE TRIBE OF
      FLORIDA AND THE STATE OF FLORIDA; RATIFICATION OF SIGNATURE AND
      ATTESTATION; LIMITED WAIVER OF SOVEREIGN IMMUNITY

                                          SEMINOLE TRIBE OF FLORIDA
                                          HOLLYWOOD, FLORIDA

RESOLUTION NO. C-297-21

WHEREAS,   the Seminole Tribe of Florida is an organized Indian Tribe as defined in Section 16 of the
           Indian Reorganization Act of June 18, 1934, as amended; and

WHEREAS,   the Tribal Council of the Seminole Tribe of Florida is the governing body of the Seminole
           Tribe of Florida; and

WHEREAS,   the Indian Gaming Regulatory Act, 25 U.S.C. § 2710, authorizes an Indian tribe to conduct
           Class III gaming on lands over which the tribe has jurisdiction by taking certain steps, one of
           which is entry into a compact with a state for Class III gaming when a "state permits such
           gaming for any purpose by any person, organization, or entity,"; and

WHEREAS,   it is in the best interests of the Seminole Tribe of Florida ("Tribe") and the State of Florida
           ("State") for the State to enter into a new gaming compact with the Tribe that recognizes the
           Tribe's right to continue offering certain Class III gaming, authorizes the Tribe to offer certain
           new Class III gaming, such as sports betting, craps and roulette, and provides additional
           substantial exclusivity for such activities in conjunction with a reasonable revenue sharing
           arrangement between the Tribe and the State that will entitle the State to significant additional
           revenue participation; and

WHEREAS,   this new gaming compact would replace the previous gaming compact approved by Tribal
           Council Resolution No. C-194-10, Gaming Compact Between the Seminole Tribe of Florida
           and the State of Florida, which went into effect on July 6, 2010, having been approved by the
           Secretary of the Interior and published in the Federal Register pursuant to 25 U.S.C. §
           2710(d)(8)(D); and

WHEREAS,   the previous gaming compact will remain in effect until the new gaming compact is approved
           by the Secretary of the Interior and published in the Federal Register; and

WHEREAS,   the Tribe, the Governor of the State of Florida and the Legislature of the State of Florida have
           negotiated the terms and conditions of a new gaming compact for the conduct of Class III
           gaming on Tribal lands of the Seminole Tribe of Florida , that provides a regulatory
           framework for the operation of certain Class III gaming which is intended to (a) ensure the fair
           and honest operation of such gaming activities; (b) maintain the integrity of all activities
           conducted with respect to such gaming activities; and (c) protect the public health, welfare and
           safety; and

WHEREAS,   the new compact was signed by the Governor of the State of Florida and the Chairman of the
           Tribal Council on April 23, 2021, and an amendment to the new compact was signed by the
           Governor of the State of Florida and the Chairman of the Tribal Council on May 17, 2021; and

RE:   2021 GAMING COMPACT AND AMENDMENT BETWEEN THE SEMINOLE TRIBE OF
      FLORIDA AND THE STATE OF FLORIDA; RATIFICATION OF SIGNATURE AND
      ATTESTATION; LIMITED WAIVER OF SOVEREIGN IMMUNITY

RESOLUTION NO. C-297-21

PAGE TWO

WHEREAS,   the Tribal Council of the Seminole Tribe of Florida, having reviewed the new gaming compact
           and amendment for the conduct of Class III gaming on Tribal lands of the Seminole Tribe of
           Florida, a copy of which new gaming compact and amendment is attached hereto, marked
           composite Exhibit "A," and by this reference is incorporated herein, is otherwise fully advised.

NOW THEREFORE BE IT RESOLVED:  the Tribal Council of the Seminole Tribe of Florida hereby
approves the new gaming compact and amendment for the conduct of Class III gaming on Tribal lands of the
Seminole Tribe of Florida, including wagers on sports betting and fantasy sports contests placed by patrons
physically located in the State, which shall be deemed to take place exclusively where the wager is received at
a gaming facility on the Tribal lands of the Seminole Tribe of Florida; and

BE IT FURTHER RESOLVED:  the signature and attestation of the new gaming compact by the Chairman of
the Tribal Council of the Seminole Tribe of Florida on April 23, 2021, and the signature by the Chairman of
the Tribal Council of the Seminole Tribe of Florida on the amendment on May 17, 2021, are hereby ratified;
and

BE IT FURTHER RESOLVED:  that the Treasurer of the Tribal Council of the Seminole Tribe of Florida is
hereby authorized and directed to expend the necessary Tribal Council funds to pay the revenue share and
annual oversight assessment to the State of Florida and the cost of the annual independent audit as described
in the new gaming compact as amended; and

BE IT FURTHER RESOLVED:  that the Tribal Council of the Seminole Tribe of Florida hereby expressly
and unequivocally waives the sovereign immunity of the Seminole Tribe of Florida for the limited purpose of
enforcing and/or resolving disputes arising under the new gaming compact as amended, as specifically limited
and set forth in Part VI and Part XIII in the new gaming compact as amended and as authorized by this Tribal
Council Resolution; all in accordance with the provisions set forth in Ordinance No. C-01-95 enacted by the
Tribal Council of the Seminole Tribe of Florida, and consents on behalf of the Seminole Tribe of Florida to
the jurisdiction of the federal and state courts having trial and appellate jurisdiction thereover as described in
the new gaming compact as amended; and

BE IT FURTHER RESOLVED:  that the Chairman of the Tribal Council of the Seminole Tribe of Florida is
hereby authorized and directed to work with the State of Florida to submit the new gaming compact as
amended to the Secretary of the Interior for approval and publication in the Federal Register; and

AR097

RE:   2021 GAMING COMPACT AND AMENDMENT BETWEEN THE SEMINOLE TRIBE OF
      FLORIDA AND THE STATE OF FLORIDA; RATIFICATION OF SIGNATURE AND
      ATTESTATION; LIMITED WAIVER OF SOVEREIGN IMMUNITY

RESOLUTION NO. C-297-21

PAGE THREE

BE IT FURTHER RESOLVED: that this resolution is hereby adopted after motion duly made by Christopher
Osceola, seconded by Larry L. Howard and a roll call vote as follows:

        Chairman Marcellus W. Osceola, Jr ............................... AYE
        Vice-Chairman Mitchell Cypress.................................... AYE
        Council Representative Mariann Billie........................... ABSTAIN
        Council Representative Larry L. Howard. ...................... AYE
        Council Representative Christopher Osceola. ............... AYE

DONE THIS THE 17th DAY OF JUNE, 2021, at the special meeting of the Tribal Council, duly convened at
the Hollywood Seminole Indian Reservation, Broward County, Florida, held virtually via audio and video
applications, with a quorum being present, by a vote of 4 For, 0 Against, and with one Abstention.

                                        Chairman
                                        TRIBAL COUNCIL

ATTEST:

Secretary
TRIBAL COUNCIL

# Florida Ratification Legislation

20212Aer

1
2          An act relating to the implementation of the 2021
3          gaming compact between the Seminole Tribe of Florida
4          and the State of Florida; amending s. 285.710, F.S.;
5          revising the definition of the term "compact";
6          providing for legislative approval and ratification of
7          a gaming compact between the Seminole Tribe of Florida
8          and the state; requiring the Governor to cooperate
9          with the Tribe in seeking approval and ratification of
10         such compact from the United States Secretary of the
11         Interior; specifying that such compact supersedes a
12         certain other gaming compact under certain
13         circumstances; revising local government share
14         distributions; authorizing the Tribe to conduct
15         additional games, contests, and sports betting;
16         providing age requirements for fantasy sports contests
17         and sports betting; specifying that certain games and
18         gaming activities do not violate the laws of this
19         state; conforming cross-references; amending s.
20         285.712, F.S.; revising requirements for the Secretary
21         of State relating to a compact; amending s. 551.102,
22         F.S.; defining the term "independent testing
23         laboratory"; amending s. 551.103, F.S.; conforming a
24         provision to changes made by the act; amending s.
25         849.086, F.S.; providing conditions, requirements, and
26         prohibitions relating to poker games played in a
27         designated player manner; prohibiting a person
28         licensed to operate a cardroom from operating certain
29         games; providing contingent effective dates.

CODING: Words stricken are deletions; words underlined are additions.

AR100

20212Aer

30
31   Be It Enacted by the Legislature of the State of Florida:
32
33        Section 1. Effective upon becoming a law, paragraph (a) of
34   subsection (1) and subsection (3) of section 285.710, Florida
35   Statutes, are amended to read:
36        285.710 Compact authorization.—
37        (1) As used in this section, the term:
38        (a) "Compact" means the most recent ratified and approved
39   gaming compact between the Seminole Tribe of Florida and the
40   State of Florida, executed on April 7, 2010.
41        (3) (a) The gaming compact between the Seminole Tribe of
42   Florida and the State of Florida, executed by the Governor and
43   the Tribe on April 7, 2010, was is ratified and approved by
44   chapter 2010-29, Laws of Florida.
45        (b) The gaming compact between the Seminole Tribe of
46   Florida and the State of Florida, executed by the Governor and
47   the Tribe on April 23, 2021, as amended on May 17, 2021, is
48   ratified and approved. The Governor shall cooperate with the
49   Tribe in seeking approval of such compact ratified and approved
50   under this paragraph from the United States Secretary of the
51   Interior. Upon becoming effective, such compact supersedes the
52   gaming compact ratified and approved under paragraph (a). If the
53   gaming compact ratified and approved under this paragraph is not
54   approved by the United States Secretary of the Interior or is
55   invalidated by court action or change in federal law, the gaming
56   compact ratified and approved under paragraph (a) shall remain
57   in effect The Governor shall cooperate with the Tribe in seeking
58   approval of the compact from the United States Secretary of the

CODING: Words stricken are deletions; words underlined are additions.

AR101

ENROLLED
2021 Legislature                                      CS for SB 2-A, 1st Engrossed

20212Aer

59  ~~Interior~~.

60       Section 2. Paragraphs (b), (c), and (d) of subsection (10)

61  and subsection (13) of section 285.710, Florida Statutes, are

62  amended, and paragraph (h) is added to subsection (10) of that

63  section, to read:

64       285.710 Compact authorization.—

65       (10) The calculations necessary to determine the local

66  government share distributions shall be made by the state

67  compliance agency based upon the net win per facility as

68  provided by the Tribe. The local government share attributable

69  to each casino shall be distributed as follows:

70       (b) Broward County shall receive 25 percent, the City of

71  Hollywood shall receive <u>42.5</u> ~~55~~ percent, the Town of Davie shall

72  receive <u>22.5</u> ~~10~~ percent, and the City of Dania Beach shall

73  receive 10 percent of the local government share derived from

74  the Seminole Indian Casino-Hollywood.

75       (c) Broward County shall receive 25 percent, the City of

76  Hollywood shall receive <u>42.5</u> ~~55~~ percent, the Town of Davie shall

77  receive <u>22.5</u> ~~10~~ percent, and the City of Dania Beach shall

78  receive 10 percent of the local government share derived from

79  the Seminole Hard Rock Hotel & Casino-Hollywood.

80       (d) Collier County shall receive <u>75</u> ~~100~~ percent <u>and the</u>

81  <u>Immokalee Fire Control District shall receive 25 percent</u> of the

82  local government share derived from the Seminole Indian Casino-

83  Immokalee.

84       <u>(h) Broward County shall receive 25 percent, the City of</u>

85  <u>Hollywood shall receive 35 percent, the Town of Davie shall</u>

86  <u>receive 30 percent, and the City of Dania Beach shall receive 10</u>

87  <u>percent of the local government share derived from the</u>

Page 3 of 9

20212Aer

88   additional facilities authorized to be added to the Tribe's

89   Hollywood Reservation under the gaming compact ratified,

90   approved, and described in subsection (3).

91        (13) (a) For the purpose of satisfying the requirement in 25

92   U.S.C. s. 2710(d)(1)(B) that the gaming activities authorized

93   under an Indian gaming compact must be permitted in the state

94   for any purpose by any person, organization, or entity, the

95   following class III games or other games specified in this

96   section are hereby authorized to be conducted by the Tribe

97   pursuant to the compact described in subsection (3)(a), if the

98   compact described in subsection (3)(b) is not effective:

99        1. (a) Slot machines, as defined in s. 551.102(9) s.

100  551.102(8).

101       2. (b) Banking or banked card games, including baccarat,

102  chemin de fer, and blackjack or 21 at the tribal facilities in

103  Broward County, Collier County, and Hillsborough County.

104       3. (c) Raffles and drawings.

105       (b) For the purpose of satisfying the requirement in 25

106  U.S.C. s. 2710(d)(1)(B) that the gaming activities authorized

107  under an Indian gaming compact must be permitted in the state

108  for any purpose by any person, organization, or entity, the

109  following class III games or other games specified in this

110  section are hereby authorized to be conducted by the Tribe

111  pursuant to the compact described in subsection (3)(b), when

112  such compact has been approved by the United States Secretary of

113  the Interior, has not been invalidated by court action or change

114  in federal law, and is effective:

115       1. Slot machines, as defined in s. 551.102(9).

116       2. Banking or banked card games, including baccarat, chemin

CODING: Words stricken are deletions; words underlined are additions.

AR103

20212Aer

117  de fer, and blackjack (21), and card games banked by the house,
118  by a bank established by the house, or by a player.
119       3. Raffles and drawings.
120       4. Craps, including dice games such as sic-bo and any
121  similar variations thereof.
122       5. Roulette, including big six and any similar variations
123  thereof.
124       6. Fantasy sports contests. The acceptance of entry fees
125  for fantasy sports contests conducted by the Tribe, including
126  the receipt of entry fees paid by players physically located
127  within the state using a mobile or other electronic device,
128  shall be deemed to be exclusively conducted by the Tribe where
129  the servers or other devices used to conduct such contests on
130  the Tribe's Indian lands are located. A person must be 21 years
131  of age or older to pay an entry fee for fantasy sports contests.
132       7. Sports betting. Wagers on sports betting, including
133  wagers made by players physically located within the state using
134  a mobile or other electronic device, shall be deemed to be
135  exclusively conducted by the Tribe where the servers or other
136  devices used to conduct such wagering activity on the Tribe's
137  Indian lands are located. A person must be 21 years of age or
138  older to wager on sports betting.
139
140  Games and gaming activities authorized under this subsection and
141  conducted pursuant to a gaming compact ratified and approved
142  under subsection (3) do not violate the laws of this state.
143       Section 3. Effective upon becoming a law, subsection (4) of
144  section 285.712, Florida Statutes, is amended to read:
145       285.712 Tribal-state gaming compacts.—

**CODING:** Words ~~stricken~~ are deletions; words underlined are additions.

AR104

20212Aer

146    (4) Upon receipt of an act ratifying a tribal-state
147 compact, the Secretary of State shall <u>coordinate with the</u>
148 <u>parties to the compact to formally submit</u> ~~forward~~ a copy of the
149 executed compact and the ratifying act to the United States
150 Secretary of the Interior for his or her review and approval, in
151 accordance with <u>25 U.S.C. s. 2710(d)(8)</u> ~~25 U.S.C. s. 2710(8)(d)~~.
152    Section 4. Present subsections (5) through (13) of section
153 551.102, Florida Statutes, are redesignated as subsections (6)
154 through (14), respectively, and a new subsection (5) is added to
155 that section, to read:
156    551.102 Definitions.—As used in this chapter, the term:
157    <u>(5) "Independent testing laboratory" means an independent</u>
158 <u>laboratory:</u>
159    <u>(a) With demonstrated competence testing gaming machines</u>
160 <u>and equipment;</u>
161    <u>(b) That is licensed by at least 10 other states; and</u>
162    <u>(c) That has not had its license suspended or revoked by</u>
163 <u>any other state within the immediately preceding 10 years.</u>
164    Section 5. Paragraph (c) of subsection (1) of section
165 551.103, Florida Statutes, is amended to read:
166    551.103 Powers and duties of the division and law
167 enforcement.—
168    (1) The division shall adopt, pursuant to the provisions of
169 ss. 120.536(1) and 120.54, all rules necessary to implement,
170 administer, and regulate slot machine gaming as authorized in
171 this chapter. Such rules must include:
172    (c) Procedures to scientifically test and technically
173 evaluate slot machines for compliance with this chapter. The
174 division may contract with an independent testing laboratory to

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

AR105

20212Aer

175  conduct any necessary testing under this section. ~~The~~
176  ~~independent testing laboratory must have a national reputation~~
177  ~~which is demonstrably competent and qualified to scientifically~~
178  ~~test and evaluate slot machines for compliance with this chapter~~
179  ~~and to otherwise perform the functions assigned to it in this~~
180  ~~chapter.~~ An independent testing laboratory shall not be owned or
181  controlled by a licensee. The use of an independent testing
182  laboratory for any purpose related to the conduct of slot
183  machine gaming by a licensee under this chapter shall be made
184  from a list of one or more laboratories approved by the
185  division.

186        Section 6. Subsection (10) and paragraph (a) of subsection
187  (12) of section 849.086, Florida Statutes, are amended, and
188  paragraph (h) is added to subsection (7) of that section, to
189  read:

190        849.086 Cardrooms authorized.—

191        (7) CONDITIONS FOR OPERATING A CARDROOM.—

192        (h) Poker games played in a designated player manner in
193  which one player is permitted, but not required, to cover other
194  players' wagers must comply with the following restrictions:

195        1. Poker games to be played in a designated player manner
196  must have been identified in cardroom license applications
197  approved by the division on or before March 15, 2018, or, if a
198  substantially similar poker game, identified in cardroom license
199  applications approved by the division on or before April 1,
200  2021.

201        2. If the cardroom is located in a county where slot
202  machine gaming is authorized under chapter 285 or chapter 551,
203  the cardroom operator is limited to offering no more than 10

**CODING:** Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

AR106

20212Aer

204 | tables for the play of poker games in a designated player
205 | manner.
206 |     3. If the cardroom is located in a county where slot
207 | machine gaming is not authorized under chapter 285 or chapter
208 | 551, the cardroom operator is limited to offering no more than
209 | 30 tables for the play of poker games in a designated player
210 | manner.
211 |     4. There may not be more than nine players and the
212 | nonplayer dealer at each table.
213 |     (10) FEE FOR PARTICIPATION; PROHIBITIONS RELATING TO
214 | ECONOMIC INTEREST AND WINNINGS FOR CERTAIN GAMES.—
215 |     (a) The cardroom operator may charge a fee for the right to
216 | participate in games conducted at the cardroom. Such fee may be
217 | either a flat fee or hourly rate for the use of a seat at a
218 | table or a rake subject to the posted maximum amount but may not
219 | be based on the amount won by players. The rake-off, if any,
220 | must be made in an obvious manner and placed in a designated
221 | rake area which is clearly visible to all players. Notice of the
222 | amount of the participation fee charged shall be posted in a
223 | conspicuous place in the cardroom and at each table at all
224 | times.
225 |     (b)1. A cardroom operator may not have any direct economic
226 | interest in a poker game played in a designated player manner,
227 | except for the rake.
228 |     2. A cardroom operator may not receive any portion of the
229 | winnings of a poker game played in a designated player manner.
230 |     (12) PROHIBITED ACTIVITIES.—
231 |     (a) No person licensed to operate a cardroom may conduct
232 | any banking game or any game not specifically authorized by this

Page 8 of 9

CODING: Words stricken are deletions; words underlined are additions.

AR107

Case 1:21-cv-02513-DLF   Document 53-1   Filed 11/09/21   Page 96 of 96

20212Aer

233 section or operate any game that violates the exclusivity
234 provided in the gaming compact ratified, approved, and described
235 in s. 285.710(3).

236      Section 7. Except as otherwise expressly provided in this
237 act and except for this section, which shall take effect upon
238 this act becoming a law, this act shall take effect only if the
239 Gaming Compact between the Seminole Tribe of Florida and the
240 State of Florida executed by the Governor and the Seminole Tribe
241 of Florida on April 23, 2021, as amended on May 17, 2021, under
242 the Indian Gaming Regulatory Act of 1988, is approved or deemed
243 approved and not voided by the United States Department of the
244 Interior, and shall take effect on the date that notice of the
245 effective date of the compact is published in the Federal
246 Register.

**CODING:** Words ~~stricken~~ are deletions; words underlined are additions.

AR 108